IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MELISSA HEARRING, individually        )
and as a natural mother and next friend of    )
B.H., a minor child,                  )
                                      )
            Plaintiff,                )            No. 3:10-cv-0746
                                      )            HAYNES/BRYANT
v.                                    )            **Jury Demand**
                                      )
KAREN SLIWOWSKI, individually and the )
METROPOLITAN GOVERNMENT OF            )
NASHVILLE-DAVIDSON COUNTY             )
                                      )
            Defendant.                )

To:    The Honorable William J. Haynes, District Judge

## REPORT AND RECOMMENDATION

### I. Introduction

By order entered August 18, 2010 (Docket Entry No. 3.), this matter was referred to the
undersigned for case management and to recommend ruling on any dispositive motions.

Plaintiff Melissa Hearring, a Middle Tennessee resident, filed this action individually and
as natural mother and best friend of B.H., a minor child, under 42 U.S.C. § 1983 against
defendants Karen Sliwowski and the Metropolitan Government of Nashville-Davidson County
("Metro"). (Docket Entry Nos. 1, 10.) Plaintiff seeks compensatory damages and reasonable
attorney fees. (Id.) Pursuant to Federal Rule of Civil Procedure 56(c), Defendants filed a motion
for summary judgment on May 31, 2011 (Docket Entry No. 26.), claiming that Ms. Sliwowski is
exempt from liability under the doctrine of qualified immunity and that plaintiffs' claims against
Metro fail as a matter of law. Plaintiff filed a response on July 9, 2011 (Docket Entry No. 31.)

1

and defendant replied on July 21, 2011. (Docket Entry No. 35.)

As further explained below, the undersigned recommends that defendant's motion for summary judgment be GRANTED and that plaintiff's action be DISMISSED.

## II. Background

In 2009, minor plaintiff B.H. was six years old and a student at Mt. View Elementary School – part of the Nashville Metropolitan School District. (Docket Entry No. 10 ¶ 4.) According to the record, B.H. had a history of bladder and urinary tract infections which would sometimes cause itching or discomfort to her genital area. (Id. ¶¶ 4-5.)

In late October of that year, B.H.'s mother, plaintiff Melissa Hearring, notified the school that B.H. was suffering from another bladder/urinary tract infection and was scheduled for an appointment with her physician on October 30. (Id. ¶ 4.) On October 28, B.H.'s teacher called Ms. Hearring to inform her that B.H. had complained during class of itching and discomfort. (Id. ¶ 5.) During the call, Ms. Hearring explained that such symptoms were consistent with B.H.'s condition and reminded the teacher of B.H.'s upcoming doctor's appointment. (Id.)

The next day, October 29, B.H. complained to her teacher again of pain and itching, and the teacher decided to escort B.H. to the school nurse's office a little before 2:00 p.m. (Docket Entry No. 33 ¶ 14.) However, because the nurse was administering medication to a diabetic student at the time, B.H. waited in the school secretary's office until the nurse was free. (Docket Entry No. 23 ¶¶ 6-7.) The secretary, Pam Back, tried to reach Ms. Hearring by phone, but was unable to get though to her and left Ms. Hearring a voice message instead. (Docket Entry No. 33 ¶ 16.)

The school nurse was defendant Karen Sliwowski. (Docket Entry No. 32 ¶ 2.) Defendant

2

Sliwowski had been working as a registered nurse since 1996 (Docket Entry No. 23 ¶ 2.) and had been employed by the Metropolitan Public Health Department as a school nurse since November, 2008. (Docket Entry No. 32 ¶ 6.)  Nurse Sliwowski worked at several different schools each day and did not arrive at Mt. View Elementary until around 2:00 p.m. on October 29. (Docket Entry No. 23 ¶ 5; Docket Entry No. 33-2, pg. 8, lines 11-21.)

After finishing her scheduled appointment with the diabetic student, Nurse Sliwowski took B.H. to the school health office to examine her. (Docket Entry No. 33 ¶ 14.) Ms. Back explained to Nurse Sliwowski that B.H. had come to the office complaining of pain and itching in her genital area, but Nurse Sliwowski was not aware at the time that B.H. was suffering from a urinary tract infection and did not inquire about B.H.'s medical history.  (Docket Entry No. 33-1, pg. 15, line 23 through pg. 16, line 4.)

In order to examine B.H., Nurse Sliwowski took her to a restroom normally reserved for teachers.  (Docket Entry No. 33 ¶ 14.)   At Nurse Sliwowski's suggestion, Ms. Back accompanied them, so that someone would be present to observe the examination. (Id.)  In the restroom, Nurse Sliwowski asked B.H. to remove her pants and underwear and to squat down. (Id.) She further asked B.H. to open her labia so that Nurse Sliwowski could inspect for any redness or irritation.  (Id; Docket Entry No. 23 ¶ 12.)  Nurse Sliwowski did not touch B.H. during the course of this inspection and claims that she was never closer than one to two feet away.  (Docket Entry No. 23 ¶ 12.)   Finding no redness or irritation, Nurse Sliwowski dismissed B.H. back to class. (Id.)

After performing the examination, Nurse Sliwowski called Ms. Hearring, but was unable to reach her.  (Docket Entry No. 33 ¶ 17.)

3

When she returned home after school on October 29, 2009, B.H. told her parents about Nurse Sliwowski's examination. (Docket Entry No. 10 ¶ 6.) Plaintiffs assert that B.H. was "confused, humiliated, and frightened" by the experience. (Id.)

The parties agree that Nurse Sliwowski received no training from the Metro Public Health Department concerning whether and under what circumstances examining a student's genitals is appropriate. (Id. ¶¶ 10; Docket Entry No. 33-9 ¶ 1.) The next day, Nurse Sliwowski contacted her supervisor, Stephanie Blansett, to explain what had happened. (Docket Entry No. 24 ¶ 14.) On November 3, 2009, Ms. Blansett issued Nurse Sliwowski a written reprimand for failing to send a note home with B.H. as required by the School Health Clinical Manual in cases when a nurse cannot reach a parent by phone. (Docket Entry No. 24-3.) The reprimand did not criticize Nurse Sliwowski for the examination itself, but did recommend that, in the future, Nurse Sliwowski consult with a supervisor "when you encounter an unfamiliar situation." (Id.) Ms. Blansett further noted, however, that "[t]here is no question as to your good intentions in this situation. I have no doubt, nor does our director, that you only wanted to help this student receive the appropriate care." (Id.)

Plaintiff filed this suit against Nurse Sliwowski and Metro on August 6, 2010 – superseded by plaintiff's amended complaint on October 15, 2010 – under 42 U.S.C. § 1983. Specifically, plaintiffs allege that Nurse Sliwowski performed an illegal "strip search" of B.H., and that Metro is liable for "not having in place any training or guidance" concerning invasive physical examinations of students. (Docket Entry No. 10 ¶¶ 8, 11.)

### III.  Conclusions of Law

4

A.  Summary Judgment

To prevail on a motion for summary judgment, the movant must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(a).  All facts and inferences must be viewed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

While the movant bears the initial burden of proving the absence of any genuine issue of material fact, the non-moving party cannot simply "rest on its pleadings but must present some 'specific facts showing that there is a genuine issue for trial.'"  Moore v. Holbrook, 2 F.3d 697, 699 (6th Cir. 1993) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Factual disputes are not material unless the resolution of those disputes "might affect the outcome of the suit."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If a factual dispute is "irrelevant or unnecessary" to the merits of the suit, it should not be counted.  Id.


B.  Qualified Immunity

The qualified immunity doctrine shields state and federal officers from civil money damages under 42 U.S.C. § 1983, except in situations where the plaintiff can plead facts showing that (1) the official violated a constitutional right, and (2) the right was "clearly established" at the time the official took action.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).[1]  Once a

_____

[1] The Sixth Circuit's formulation of the qualified immunity test sometimes adds a third prong, whether the official's conduct was "objectively unreasonable in light of the clearly established constitutional right at issue."  Champion v. Outlook Nashville, Inc., 380 F.3d 893, 900-01 (6th Cir. 2004).  But see Ciminillo v. Streicher, 434 F.3d 461, 466 (6th Cir. 2006) (employing a two-prong analysis, with "objective reasonableness" incorporated into the

5

defendant moves for summary judgment on the basis of qualified immunity, the *plaintiff* bears the burden of proving that qualified immunity does not apply. Ciminillo v. Streicher, 434 F.3d 461, 466 (6th Cir. 2006); Gardenshire v. Schubert, 205 F.3d 303, 311 (6th Cir. 2000). The court, however, must still construe all disputed facts in the light most favorable to the non-moving party. Ciminillo, 434 F.3d at 466.

In Saucier v. Katz, the Supreme Court laid down a rigid framework for lower courts to follow when analyzing qualified immunity claims. 533 U.S. 194 (2001), overturned by Pearson v. Callahan, 555 U.S. 223 (2009). Specifically, the Court held that the two-step qualified immunity analysis must progress in the "proper sequence." Id. at 200. The lower court must first determine whether the official violated a constitutional right, and only then consider whether the right was clearly established. Id. Writing for the majority, Justice Kennedy explained that in analyzing whether a constitutional provision has been violated, the court may find it necessary to set forth principles that will later become the basis for a holding that a particular right is clearly established. Id. at 201. He further explained that "[t]he law might be deprived of this explanation were a court simply to skip ahead to the question of whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." Id.

Saucier, however, proved an unpopular decision, leading many U.S. Court of Appeals judges to publically call on the Supreme Court to overrule it. In Lyons v. City of Xenia, for example, Judges Sutton and Gibbons of the Sixth Circuit openly questioned the "rigidity" of Saucier's requirements and whether it makes sense to force lower courts to answer the

---

constitutional violation analysis). However, for the reasons set forth below, the undersigned concludes that the current matter can be disposed of without considering this third prong.

constitutional question first, "no matter the costs, no matter the ease with which the second question might be answered." 417 F.3d 565, 580 (6th Cir. 2005) (Sutton, J., concurring).

The Supreme Court took note of this criticism in Pearson v. Callahan, and ultimately overturned Saucier's rigid two-step analysis. 555 U.S. 223, 236 (2009). The Court noted that while the "sequence set forth there [in Saucier] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion." Id.

Based on this recent guidance from the U.S. Supreme Court and the Sixth Circuit, and for the reasons explained below, the undersigned concludes that in the present case the second question – whether the claimed right is "clearly established" – can be answered with relative ease, while the first question – whether the official has violated the constitution to begin with – would be "difficult and fact intensive." Lyons v. City of Xenia, 417 F.3d 565, 580 (6th Cir. 2005) (Sutton, J., concurring). Accordingly, the undersigned will assume without deciding that Nurse Sliwowski conducted an unreasonable, unconstitutional search, and will move on to analyze whether B.H.'s claimed right was clearly established on October 29, 2009.

C. Plaintiffs' § 1983 Claim Against Defendant Sliwowski

a. The constitutional right asserted

In response to defendant Sliwowski's assertion of qualified immunity, plaintiffs argue that defendant's conduct violated B.H.'s clearly established right "to be free from unreasonable searches as guaranteed by the Fourth Amendment of the United States Constitution." (Docket Entry No. 33 at 5.) At the outset, the undersigned notes that this circuit typically analyzes

7

violation-of-privacy claims under the aegis of the Fourth Amendment, rather than the Due Process Clause of the Fourteenth Amendment.  Brannum v. Overton County Sch. Bd., 516 F.3d 489, 494 (6th Cir. 2008) ("We conclude that the privacy right involved here is one protected by the Fourth Amendment's guarantee against unreasonable searches."); Kent v. Johnson, 821 F.2d 1220, 1226 (6th Cir. 1987).  The undersigned therefore agrees with plaintiffs that B.H.'s clearly established rights in this case, if any, arise from the Fourth Amendment's prohibition against unreasonable searches and seizures.

There is no question that B.H., as an elementary school student, possessed a general right to be free from unreasonable searches and seizures on October 29, 2009.  The Supreme Court addressed this issue in New Jersey v. T.L.O., 469 U.S. 325 (1985), noting that, despite the difficulty of maintaining discipline in public schools, "the situation is not so dire that students in the schools may claim no legitimate expectations of privacy." Id. at 338. Resolving an ambiguity that had previously split the courts of appeal, the Court emphatically stated that the Fourth Amendment's "prohibition on unreasonable searches and seizures applies to searches conducted by public school officials." Id. at 333.

The Court went on to emphasize, however, that the Fourth Amendment protects against *unreasonable* searches and seizures, and that teachers and school officials must have more leeway to conduct a search of a student than a law officer would.  Id. at 341-42.  In contrast to traditional "probable cause" analysis,  a teacher or school official's search of a student will be reasonable so long as (1) the action is justified at its inception by *reasonable suspicion* that the search will "turn up evidence that the student has violated or is violating either the law or the rules of the school;" and (2) the search is "reasonably related in scope to the circumstances

8

which justified the interference in the first place." Id. (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)).

The law is similarly clear that a "strip search" is a particularly intrusive invasion of a student's privacy. In Safford United School District No. 1 v. Redding, for example, the Supreme Court determined that school officials' reasonable suspicion that a student was carrying contraband pills justified a search of the student's backpack and outer clothing, but *did not* justify forcing the student to "pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree." 129 S. Ct. 2633, 2638 (2009). The Court further noted that the "indignity of the search does not, of course, outlaw it, but it does implicate the rule of reasonableness" and that the school's suspicion did not match the degree of intrusion. Id. at 2642. Officials had no reason to suspect the student of hiding pills in her underwear, other than a vague, general belief that students hide contraband under their clothing. Id. The Safford Court specifically noted that such a search "and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions." Id. at 2643.

Similarly, the Sixth Circuit has held that searches or surveillance that expose students' naked bodies require strong, particularized suspicion to pass constitutional muster. In Beard v. Whitmore Lake School District, the court had to determine whether a strip search of male and female students – as part of a search for a student's stolen money – was constitutional. 402 F.3d 598, 603-04 (6th Cir. 2005). While the court recognized that lack of individual suspicion did not, *ipso facto*, render the search unreasonable, the fact that students were required to disrobe did make the search "far more invasive." Id. at 605. On the other side of the balance, the state's

9

interest was comparatively minor, since "a search undertaken to find money serves a less weighty governmental interest than a search undertaken for items that pose a threat to the health or safety of students." Id. Reviewing all of the facts, the court concluded that the narrow governmental interest and the fact that the searches were performed on a substantial number of students, without any individualized suspicion, and without consent demonstrated that the searches were unreasonable. Id.

More recently, in Brannum v. Overton County School Board, the Sixth Circuit ruled that a middle school's decision to install security cameras in the boys and girls locker rooms was an unconstitutional violation of student privacy. 516 F.3d 489, 494 (6th Cir. 2008). The court in that case emphasized that there was nothing in the record to suggest that "the defendants entertained any concerns about student safety or security in the locker rooms that would reasonably justify the installation of the cameras to record all the activities there." Id. at 498. There were no claims of locker room misconduct and no reasonable suspicion of "wrongful activity or injurious behavior in the future." Id. The court also denied the school officials' request for qualified immunity, despite the lack of factually analogous precedent. The court reasoned that "[s]ome personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion." Id. at 499.

*b. The novelty of B.H.'s claimed constitutional right.*

Based on the above analysis, the undersigned has no problem concluding that, on October 29, 2009, B.H. possessed a clearly established right to be free from unreasonable searches and seizures by school officials, and that a "strip search" is a particularly intrusive form

10

of search, requiring a heightened showing of government interest to be reasonable under the Fourth Amendment. However, it does not necessarily follow that B.H. had any "clearly established" right to be free from Nurse Sliwowski's examination. In fact, available case law strongly suggests she did not.

Plaintiffs and defendants disagree at the outset over the proper constitutional framework for analyzing this case. Defendants draw the undersigned attention's to Vernonia School District 47J v. Acton, 515 U.S. 646 (1995), emphasizing that public school students have a reduced expectation of privacy, especially with regard to medical examinations and procedures. (Docket Entry No. 27 at 11.) Plaintiffs, in turn, suggest that this reliance on Vernonia is misplaced, as the medical exam in that case was "a drug screening policy for student athletes who had voluntarily agreed to its requirements as a condition to participating in athletics, not the invasion of a six year old child's right to privacy by having her disrobe in front of a school nurse and school secretary." (Docket Entry No. 33 at 6.) Instead, plaintiffs argue that Nurse Sliwowski's search clearly falls under the aegis of  New Jersey v. T.L.O. and that "the search of a child's person is a *severe* violation of subjective expectations of privacy." (Docket Entry No. 33 at 6) (emphasis in original). While both positions have merit, the undersigned agrees with defendants that Vernonia is a more useful starting point than T.L.O. in determining whether B.H.'s constitutional rights were clearly established.

New Jersey v. T.L.O. arose from a dispute over a school *investigative* search, and the Court's holding reflected that factual basis. In particular, in establishing its "reasonable suspicion" test for school searches, the Court noted that a search will be justified at its inception when there are "reasonable grounds for suspecting that the search will turn up evidence that the

11

student has violated or is violating either the law or the rules of the school." 469 U.S. at 341-42. That test is inapplicable here. Plaintiffs do not allege, nor do defendants assert, that Nurse Sliwowski searched B.H. for any evidence of misbehavior.

The Sixth Circuit appears to have adopted a somewhat broader reading of T.L.O., adding reasonable suspicion "that a student is in imminent danger of injury on school premises" to the Supreme Court's reasonable suspicion of wrongdoing. Brannum v. Overton County Sch. Bd., 516 F.3d 489, 496 (6th Cir. 2008). This addition, however, does not make T.L.O.'s investigative framework any more applicable. Nurse Sliwowski was not trying to prevent an *imminent* injury when she examined B.H. Instead, Nurse Sliwowski was trying to determine what medical care, if any, B.H. required for her *existing* medical condition.

In contrast to T.L.O., the Supreme Court construed the search in Vernonia as a "special needs" search rather than an investigative one. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995). The Vernonia Court explained that Fourth Amendment rights "are different in public schools than elsewhere" and that "the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children. For their own good and that of their classmates, public school children are routinely required to submit to various physical examinations, and to be vaccinated against various diseases." Id. at 656. There is no meaningful dispute that Nurse Sliwowski examined B.H. believing the investigation to be for B.H.'s "own good." The parties, of course, dispute whether the examination *really was* for B.H.'s own good, but that dispute is irrelevant to the question of how to categorize the search. The Court in Vernonia explained that "when the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake." Id. at 665.

12

From the available facts, the undersigned concludes that this is the proper standard for analyzing Nurse Sliwowski's examination of B.H.

While defendants are correct that <u>Vernonia</u> states the proper legal standard, plaintiffs are correct that <u>Vernonia</u> is distinguishable on its facts. In upholding the Vernonia School District's drug testing policy, the Supreme Court relied in part on its finding that student athletes have a lower expectation of privacy than other students. <u>Id.</u> at 657. The Court noted that school athletics is broadly analogous to closely regulated industries, in that "students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy." <u>Id.</u> Additionally, the Court took note of the fact that the intrusion on student privacy in <u>Vernonia</u> was comparatively minor. Male students had to produce urine samples at a urinal along a wall, remaining fully clothed and observed only from behind, if at all. <u>Id.</u> at 658. Female students used enclosed bathroom stalls, with female monitors standing outside to monitor only for sounds of tampering. <u>Id.</u>

B.H., in contrast, was not a student athlete, and Nurse Sliwowski's examination fully exposed B.H.'s genitals. These facts differ enough from <u>Vernonia</u> that the Supreme Court's holding in that case provides little guidance on whether Nurse Sliwowski's examination was one "that a reasonable guardian or tutor might undertake."

In fact, research has uncovered *no* precedent that is closely on point. In their respective briefs, the parties agree that B.H.'s complaint involves a novel factual claim. <u>Compare</u> Docket Entry No. 33 at 17 ("In some respects, this is a true case of first impression, as the Defendants imply, at least in theory.") <u>with</u> Docket Entry No. 35 at 3 ("[T]here is no authority to support a finding that Ms. Sliwowski violated B.H.'s constitutional rights."). The undersigned agrees that

13

this case is one of first impression, and finds this fact to weigh strongly in favor of qualified immunity, though it is not, itself, dispositive.

In determining whether a particular right is "clearly established," lower courts in this circuit must "first look to decisions of the Supreme Court, then to decisions of this Court [the Sixth Circuit], and last to decisions of other Circuits." Ciminillo v. Streicher, 434 F.3d 461, 468 (6th Cir. 2006).

As explained above, none of the Supreme Court's decisions are particularly instructive. T.L.O. and Safford United School District both arose from investigative searches for wrongdoing, and thus have little applicability to the current facts. Vernonia, in turn, involved a much less intrusive search than Nurse Sliwowski's examination of B.H. Nor does the Court's broader "special needs" jurisprudence provide anything but the most general guidance. See, e.g., Ashcroft v. Al-Kidd, 131 S.Ct. 2074, 2081 (2011) ("A judicial warrant and probable cause are not needed where the search or seizure is justified by 'special needs, beyond the normal need for law enforcement.'" Quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995)). Finding no case law on point from the Supreme Court, the undersigned moves on to consider precedent from the Sixth Circuit.

The "school search" decisions from this circuit are also largely inapposite – for the same basic reason that T.L.O and Safford United School District are inapposite. Beard v. Whitmore Lake School District, for example, specifically addressed the reasonableness of strip-searching students, but only in the narrow context of investigating the theft of a student's money. 402 F.3d 598, 601 (6th Cir. 2005); see also Tarter v. Raybuck, 742 F.2d 977, 982 (6th Cir. 1984) ("[T]he authority of the school official would not justify a degrading body cavity search of a youth in

14

order to determine whether a student was in possession of contraband in violation of school rules.").

Brannum v. Overton County School Board is somewhat more relevant, as it did not involve a search for specific wrongdoing. 516 F.3d 489, 491-92 (6th Cir. 2008). Brannum, however, addressed videotaping of student locker rooms without evidence of any "threat to security in the locker rooms." Id. at 498. In deciding whether this video surveillance was reasonable in scope, the Sixth Circuit emphasized that the school officials had never claimed "that any misconduct occurred in these areas in the past or that the plan to install surveillance equipment in the school locker rooms was adopted because of any reasonable suspicion of wrongful activity or injurious behavior in the future." Id. This surveillance too appears to be have been investigative in nature, though admittedly not in the same narrow sense as the searches in Beard or Tarter.

Furthermore, Nurse Sliwowski, unlike the school officials in Brannum, *did* have a reasonable suspicion of finding visible symptoms of a medical condition in B.H.'s genital region, as that is where B.H. complained of feeling pain and itching. Brannum pitted a strong privacy interest against a weak – bordering on negligible – state interest in placing cameras in locker rooms. In contrast, the present case pits a strong privacy interest against a *strong* state interest – ensuring the health and well-being of a public school student. Brannum, therefore, is too far removed from the present facts to serve as viable precedent.

Looking beyond the school search context, the undersigned notes that the Sixth Circuit has also addressed the issue of intrusive bodily exposure in prisons. In Kent v. Johnson, a male inmate challenged a prison's policy of allowing female guards access to all areas of his facility,

including the men's shower and individual cells. 821 F.2d 1220, 1222 (6th Cir. 1987). The court, however, framed the basic dispute as the "reasonableness of the surveillance by *female* prison guards of plaintiff's person in various states of undress." Id. at 1226 (emphasis supplied). Plaintiff's complaint, in other words, was not that he was being forced to expose his naked body to prison officials, but that he was having to expose it to *women*. Because Nurse Sliwowski and B.H. were both female, that issue is simply not present here and, as a result, Kent v. Johnson is inapposite.

Finding no case law from this Circuit that addresses the reasonableness of intrusive, non-investigative examinations of school students, the undersigned next turns to decisions of other courts of appeals. Research, however, has revealed only one factually analogous case.[2]

In Gruenke v. Seip, the Third Circuit considered the question of whether it was constitutionally reasonable for a swim coach to force one of his athletes to take a pregnancy test. 225 F.3d 290 (3d Cir. 2000). Analyzing the dispute under the Vernonia, rather than T.L.O. framework, the court concluded that "a school cannot compel a student to take a pregnancy test absent a legitimate health concern about a possible pregnancy and the exercise of some discretion." Id. at 301. From the facts in the record, the court concluded that the coach was not acting out of any concern for either the student or the fetus' health or safety, but simply "to satisfy his curiosity." Id. Critically, however, the Third Circuit emphasized that "[t]his is not to say that a student, athlete or not, cannot be required to take a pregnancy test. There may be

---

[2] The undersigned notes that there is a somewhat broader body of case law addressing *investigative* medical examinations. See Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 2000); Van Emrik v. Chemung County Dept. of Soc. Servs., 911 F.2d 863 (2d Cir. 1990). However, the undersigned agrees with defendant that the constitutional analysis is fundamentally different in such cases and that the decisions are not on point. (See Docket Entry No. 27 at 11-12.)

16

unusual instances where a school nurse or another appropriate school official has legitimate concerns about the health of the student or her unborn child." Id. The Gruenke Court thus left open the very question that this court is now being asked to decide – whether, and under what circumstances, legitimate health concerns can justify the intrusive search of a student.

The Sixth Circuit has emphasized that case law from other circuits can clearly establish a constitutional right only where that authority points "unmistakably to the unconstitutionality of the conduct complained of" and is "so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 608 (2005) (quoting Williams by Williams v. Ellington, 936 F.2d 881, 885 (6th Cir. 1991)). That is clearly not the case here. In light of this ambiguity and the dearth of relevant authority, the undersigned cannot conclude that Gruenke – or any other court of appeals opinion – clearly established B.H.'s right to be free from Nurse Sliwowski's examination.

> *c. There is no "general constitutional principle" clearly establishing B.H.'s claimed right.*

In response to defendant's motion for summary judgment, plaintiffs argue that the novelty of the factual circumstances does not preclude a finding that B.H.'s Fourth Amendment right was clearly established at the time of Nurse Sliwowski's examination. (Docket Entry No. 33 at 9-10.) Specifically, plaintiffs draw the undersigned's attention to Supreme Court and Sixth Circuit precedent holding that "there need not be a case with the exact same fact pattern, or even "fundamentally similar" or "materially similar" facts. Hope v. Pelza, 536 U.S. 730, 741 (2002); see also Lyons v. City of Xenia, 417 F.3d 565, 572 (6th Cir. 2005) (recognizing that general tests for excessive force can clearly establish a right even without a body of relevant case law);

17

Sample v. Bailey, 409 F.3d 689, 699 (6th Cir. 2005); Feathers v. Aey, 319 F.3d 843, 848 (6th

Cir. 2003). Instead, the critical question is whether a defendant has "fair warning" that his

actions are unconstitutional. Hope, 536 U.S. at 741.

While plaintiffs correctly state the law on this issue, they fail to identify a constitutional

rule or principle that could have fairly warned Nurse Sliwowski that her examination was

unlawful.[3] Instead, they fall back on general – and undisputed – contentions that "Fourth

Amendment protections have been applied to school students in school settings" and that "school

officials may only search a student under [the] objective reasonableness standard." (Docket

Entry No. 33 at 9-10.) Such precepts – without any factually relevant context – are clearly

insufficient, especially in light of the fact that plaintiffs carry the burden of proving qualified

immunity does not apply. The Supreme Court recently noted in Ashcroft v. al-Kidd that "the

general proposition, for example, that an unreasonable search or seizure violates the Fourth

Amendment is of little help in determining whether the violative nature of *particular conduct* is

clearly established." 131 S.Ct. 2074, 2084 (2011) (emphasis supplied). The Court similarly

noted that while a lower court need not identify a case "clearly on point" to find a right clearly

established, "existing precedent must have placed the statutory or constitutional question beyond

debate." Id. at 2083.

The Sixth Circuit's decisions in Sample v. Bailey, Walker v. Davis, and Lyons v. City of

Xenia are particularly instructive on this point. In Sample, a police officer shot a fleeing,

unarmed burglar, who in turn sued the officer for excessive force under 42 U.S.C. § 1983. 409

---

[3] The undersigned emphasizes again that this Report and Recommendation offers no
opinion on whether Nurse Sliwowski actually violated B.H.'s Fourth Amendment rights.

18

F.3d 689, 691-94 (6th Cir. 2005).  On summary judgment, viewing all facts in the light most favorable to the burglar, the court first concluded that the police officer had in fact violated the Fourth Amendment.  Id. at 697-98.  The officer, however, argued that the burglar's constitutional right had not been clearly established at the time of the shooting, as "a reasonable officer would be unaware that he could not use deadly force to seize a burglary suspect, who was unarmed but found hiding in a building at night."  Id. at 698.  The court disagreed.

Accepting, for the sake of argument, that a "factually similar precedent may not have existed," the Sixth Circuit nonetheless found the dispute to be an "obvious case."  Id. at 699.  It noted the long established, general rule that a criminal suspect has the right not to be shot "unless he [is] perceived to pose a threat to the pursuing officers or to others during flight."  Id. (quoting Robinson v. Bibb, 840 F.2d 349, 351 (6th Cir. 1988)).  Since the officer's version of the facts did not, in the court's opinion, raise a genuine dispute as to whether the burglar was posing a threat at the time the officer shot him, the novelty of the circumstances was irrelevant to whether the burglar's right was clearly established.

Similarly, in Walker v. Davis, the Sixth Circuit upheld a denial of qualified immunity to a police officer who intentionally rammed his car into a fleeing suspect's motorcycle, ultimately killing the suspect.  649 F.3d 502, 503 (6th Cir. 2011).  While the court conceded that there were few, if any, reported cases at the time involving police cruisers intentionally ramming motorcycles, it noted further noted that "[i]t has been settled law for a generation that, under the Fourth Amendment, 'where a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'"  Id. (quoting Tennessee v Garner, 471 U.S. 1, 11 (1985)).  Finding that the suspect

19

posed no threat at the time, the court concluded that ramming his motorcycle was an "obvious" application of potentially deadly force and thus refused to confer qualified immunity on the officer.  Id. at 503-04.

Three months after denying qualified immunity in Sample, the Sixth Circuit decided Lyons v. City of Xenia, another excessive force case addressing whether a suspect's rights were "clearly established."  417 F.3d 565, 578-79 (6th Cir 2005).  Lyons did not involve a police officer shooting a suspect or ramming a suspect's vehicle with a car.  Instead, the suspect in Lyons alleged that an arresting officer used excessive force by tackling her in the course of making an arrest.  Id. at 578.[4]

Two of the three panel judges agreed with the suspect that her constitutional rights had been violated.[5]  Id. at 580, 584.  But the court nonetheless found qualified immunity to apply, as the right at issue was not clearly established.  Id. at 578-79.  In particular, the court found that even accepting all of plainitff's allegations as true, there was nothing "obvious" about the officer's misconduct, and further found that "the standards governing the constitutionality of Lyons' excessive-force tackling claim depend very much on the facts of each case."  Id. at 579 (quoting Brosseau v. Haugen, 543 U.S. 194, 201 (2004)).

_____

[4] In an earlier decision, the court had upheld a grant of qualified immunity to the same officer on a charge of handcuffing the suspect too tightly, but had denied qualified immunity on the tackling charge.  417 F.3d at 569.  The Supreme Court, however, ordered the Sixth Circuit to reconsider in light of the Court's recent opinion in Brosseau v. Haugen, 543 U.S. 194 (2004), which emphasized that the right at issue must be clearly established in "a more particularized, and hence more relevant, sense."  Id. at 599.

[5] Saucier v. Katz was still good law at the time the Sixth Circuit decided Lyons, thus obligating the court to decide the constitutional violation question before deciding whether the constitutional right was clearly established.  Lyons, 417 F.3d at 571.

20

Plaintiffs' claim against Nurse Sliwowski clearly falls on the <u>Lyons</u> side of this divide rather than the <u>Sample</u>/<u>Walker</u> side. The Sixth Circuit has previously noted that reasonable search cases under the Fourth Amendment are heavily fact-dependent in much the same way as excessive force cases. See <u>Beard v. Whitmore Lake Sch. Dist.</u>, 402 F.3d 598, 607 (6th Cir. 2005) ("Given the lack of factual context similar to that in this case, *T.L.O* and *Vernonia* could not have 'truly compelled' the defendants to realize that they were acting illegally when they participated in the searches of the students in this case."). Under the Supreme Court's <u>Al-Kidd</u> standard, plaintiffs must be able to show that Nurse Sliwowski's *particular conduct* – visually examining the genital area of a student who had been complaining of genital pain and itching – was clearly prohibited as of October 29, 2009. They have not done so.

While the undersigned expresses no opinion on whether Nurse Sliwowski's conduct actually violated B.H.'s Fourth Amendment rights, the record clearly establishes that Nurse Sliwowski's conduct falls along the "hazy border" between reasonable and unreasonable searches. <u>Cf.</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 206 (2001) (quoting <u>Priester v. Riviera Beach</u>, 208 F.3d 919, 926-27 (11th Cir. 2000)) overturned on other grounds by <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009). She is therefore entitled to qualified immunity.

Accordingly, the undersigned recommends that defendant's motion for summary judgment be GRANTED, and that plaintiff's complaint against defendant Sliwowski be DISMISSED.

<u>D. Plaintiffs' § 1983 Claim Against Nashville Metropolitan Government</u>

In addition to their claim against Nurse Sliwowski, plaintiffs allege that Metro violated

21

plaintiffs' constitutional rights through its "deliberate indifference" and failure to provide guidance to school nurses on how to handle situations such as B.H.'s complaints of pain and itching on October 29, 2009. (Docket Entry No. 10 ¶ 11.)

The doctrine of qualified immunity protects state and federal *officials*, Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982), not governmental entities. The fact that Nurse Sliwowski is entitled to qualified immunity is therefore irrelevant to the issue of whether Metro is liable for any deficiencies in its training of school nurses. See, e.g., Barber v. City of Salem, Ohio, 953 F.2d 232, 238 (6th Cir. 1992) ("[I]t is possible that city officials may be entitled to qualified immunity for certain actions while the municipality may nevertheless be liable for the same actions."). Once again, the undersigned will assume, without deciding, that Nurse Sliwowski violated plaintiffs' Fourth Amendment rights when she performed her October 29, 2009 examination. For the reasons that follow, however, the undersigned concludes that there is no reasonable dispute over any fact pertinent to plaintiff's deliberate indifference claim, and that defendant Metro is entitled to judgment as a matter of law.

### a. Legal Standard For Municipal Liability under § 1983

By its own terms, 42 U.S.C. § 1983 creates a cause of action against any "person" who deprives another of "any rights, privileges, or immunities secured by the Constitution and laws." A municipal or local government can constitute a "person" subject to liability, but only to the extent that the government itself "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011) (quoting Monell v. New York Dep't of Soc. Servs., 436 U.S. 658, 692 (1978)). The government, in other words, is not vicariously liable for the actions of its employees.

22

Municipal liability under § 1983 arises in two basic circumstances – (1) when some official policy causes a constitutional injury, <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480-81 (1986); and (2) when a government fails to train employees about their duty not to violate individuals' constitutional rights.  <u>Connick</u>, 131 S.Ct. at 1359.  Since plaintiffs and defendants agree that Metro had no explicit policy or training program on genital examination of students, liability must arise – if at all – from Metro's failure to properly train its nurses. (Docket Entry No. 27 at 7-8; Docket Entry No. 33 ¶ 12.)

In <u>City of Oklahoma City v. Tuttle</u>, Justice Rehnquist, writing for a four-member plurality, questioned whether failure to train was a viable claim against a local government, and also suggested that a "single incident" of misconduct should never suffice to make out such a claim under § 1983.  471 U.S. 808, 823-24 (1985).  The Court clarified its position somewhat in <u>City of Canton, Ohio v. Harris</u>, explicitly recognizing "failure to train" as a viable legal theory, but holding that liability under that theory only arises when the government's failure to train constitutes "deliberate indifference" to the rights of individuals with whom its employees interact.  489 U.S. 378, 389 (1989).  The Court explained that for some employees, the need for training will be so obvious, and the "inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." <u>Id.</u> at 390.   As an example, the Court noted that city policymakers should know that their police officers are equipped with firearms, and will often need to arrest fleeing suspects, and that the need to train those officers on how to use their firearms lawfully is so obvious that a failure to do so could be properly characterized as "deliberate indifference." <u>Id.</u> at 390 n.10.

More recently, in <u>Connick v. Thompson</u>, the Court emphasized that "single incident" liability is a rare and  narrow exception to the general requirement that plaintiffs prove a pattern of violations before failure-to-train liability can arise.  131 S.Ct. 1350, 1366 (2011).  As a result, a plaintiff's claim against a municipality is at its "most tenuous" when it hinges on a failure to train arising from a single incident of misconduct.  <u>Id.</u> at 1359.  The <u>Connick</u> Court also noted that a showing by the plaintiff that additional training "would have been helpful in making difficult decisions" does not give rise to liability, and that § 1983 does not provide plaintiffs with "*carte blanche* to micromanage local governments throughout the United States."  <u>Id.</u> at 1363.

The Sixth Circuit has also addressed the proper scope of failure-to-train liability under  § 1983, and has expressed a similar skepticism.  In <u>Gray v. City of Detroit</u>, the court was asked to decide whether a police department had failed to train its officers on preventing detainees from committing suicide, such that the department was deliberately indifferent to the detainees' constitutional rights.  399 F.3d 612, 616-17 (6th Cir. 2005).  Applying the Supreme Court's test from <u>City of Canton</u>, the court explained that the police department would only be liable if it violated its duty "to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable."  <u>Id.</u> at 618.

Based on this guidance from the Supreme Court and Sixth Circuit, this court must reject Metro's motion for summary judgment so long as some reasonable dispute exists as to whether it ignored an "obvious" and "foreseeable" risk that its nurses would unlawfully examine the genital areas of Metro students.  However, from the available evidence, it is clear that no such dispute exists and that Metro is therefore entitled to judgment as a matter of law.

24

> *b.  The risk of harm under these facts cannot support a claim of deliberate indifference against Metro.*

In their brief opposing defendant's motion for summary judgment, plaintiffs assert that the issue before the court is "easily articulated."  (Docket Entry No. 33 at 15.)  The issue, according to plaintiffs, is whether or not the record admits of "genuine issues of material fact as to whether or not the need to train school nurses is 'obvious.'" (Id.)  Plaintiffs go on to ask, rhetorically, "what could be more obvious than the need of equipping school nurses with a policy dealing with when, and under what circumstances, a non-consensual examination of the student's genitals (and a child of tender years) can be performed by a school nurse."  (Id. at 16)  The strength of plaintiffs' conviction, however, is belied by their lack of evidence.

In support of the claim that Metro knew or should have known the risk that intrusive examinations, such as Nurse Sliwowski's examination of B.H., would occur, plaintiffs rely heavily on the expert statement of Mariann Cosby, a registered nurse. (Id. at 15) ("The Cosby Affidavit, standing alone, creates a genuine issue of material fact.").  However, as defendants point out, the Cosby Affidavit never actually addresses Metro's alleged failure to train.  (See Docket Entry No. 35 at 8.)  Instead, the affidavit expresses Nurse Cosby's opinion that Nurse Sliowowski did not follow the proper "nursing process" when examining B.H. (Docket Entry No. 33-10 at 7-8.)  Plaintiffs assert that this affidavit "speaks squarely not only to Ms. Sliwowski's errors but also why school nurses require explicit guidance from their municipal employers," suggesting that Nurse Sliwowski's mistakes are attributable to her inadequate training.  (Docket Entry No. 33 at 16-17.)

The problem with this line of argument is that Metro *did* provide guidance and training to its nurses, including Nurse Sliwowski.  Plaintiffs do not dispute that Metro required its school

25

nurses to undergo a one month orientation or that Nurse Sliwowski did so. (Docket Entry No. 32 ¶ 7.)[6] Nor do plaintiffs dispute that Metro requires incoming nurses to "shadow" established school nurses, or that Metro explicitly instructs incoming nurses to confer with a supervisor or mentor when faced with an unfamiliar situation. (Id. at ¶¶ 10, 12.) Plaintiffs' allegation – that Metro relies on "nursing school professors and state licensing authorities for *absolutely everything*" (Docket Entry No. 33 at 16) (emphasis supplied) – is thus contradicted by the record and is not well-taken.

Plaintiffs' true argument is that Metro's training was insufficient (rather than non-existent), as it did not provide explicit guidance on the subject of student genital examinations. Plaintiffs, for example, assert that the "Metropolitan Government should have been aware of learned treatises in the area of school nurses, such as *Quality Information in the School Setting* which defines parental consent requirements." (Id. at 14.) Here, plaintiffs are doing precisely what the Supreme Court forbade in Connick v. Thompson, trying to micromanage municipal policy. 131 S.Ct. 1350, 1363 (2011). The issue in this case is not whether plaintiffs' proposals or recommended treatises would *better* prevent unlawful searches than the policies now in place; the issue is whether Metro's policies were constitutionally *adequate*. The answer to that question, in turn, can only be revealed through evidence on whether the policies in place were so inadequate, and so likely to lead to a constitutional violation, that policymakers were "deliberately indifferent," to plaintiffs' constitutional rights. City of Canton, Ohio v. Harris, 489

---

[6] Plaintiffs state that "[T]o the extent this statement implies that the Orientation program adequately prepared these Defendants for the Circumstances in this case, DENIED." (Docket Entry No. 32 ¶ 7). Since plaintiffs dispute the alleged "implication" of the program rather than its existence, the undersigned concludes that plaintiffs admit that such a program exists.

U.S. 378, 390 (1989).

Plaintiffs provide no such evidence.  Instead, they suggest that "[i]t does not take a leap of logic to accept that Metro knew or should have known that a search of a student by a school nurse could occur."  (Docket Entry No. 33 at 13).  While this statement is undoubtedly true, it *does* take a leap of logic to accept plaintiffs' claim that Metro knew or should have known that the training it provided was insufficient to prevent unlawful searches.  Plaintiffs have not identified any "pattern" of similar violations that could have put Metro on notice, and two officials in the Metropolitan Public Health Department have declared that they have no recollection of any school nurse prior to Nurse Sliwowski examining a student's genitals. (Docket Entry No. 24 ¶ 13; Docket Entry No. 25 ¶ 3.)[7]  Nor is this particular risk – the unlawful examination of a student's genitals – so clear that the need for explicit, particularized training becomes "obvious."  Compared to the hypothetical policemen in City of Canton, who *often* needed to apprehend fleeing suspects, and who therefore required training on how to do so constitutionally,489 U.S. 378, 390 n.10 (1989), there is no evidence on record that Metro nurses had *ever* needed to examine a student's genitals before – with or without parental consent.  It therefore stretches credulity for plaintiffs to assert that Metro was deliberately indifferent to the risk of an unconstitutional examination.

Beneath the vague inferences and allegations, plaintiffs' argument is inherently circular:

_____

[7] The undersigned is aware that defendants, in their proposed Statements of Undisputed Facts, included this statement, and that plaintiffs have objected on grounds that the statement "is not within the meaning of Article IV of the Federal Rules of Evidence not [sic] is it in any way material to the pending Motion for Summary Judgment."  (Docket Entry No. 32 ¶ 27.)  Plaintiffs' objection is not well-taken.  The Supreme Court has explicitly noted that the existence of a pattern of violations is relevant to the question of municipal liability under § 1983.  Bd. of County Com'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 408-09 (1997)

Nurse Sliwowski violated B.H.'s Fourth Amendment rights because Metro failed to properly train her, and the proof that Metro failed to properly train her is that Nurse Sliwowski violated B.H.'s Fourth Amendment rights. Both the Supreme Court and Sixth Circuit have rejected such arguments. City of Canton, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city."); Miller v. Calhoun County, 408 F.3d 803, 816 (6th Cir. 2005) ("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability.").

Reviewing the record, and mindful of the Supreme Court's guidance that deliberate indifference is "a stringent standard of fault," especially for failure-to-train allegations arising from a "single incident" of misconduct, Connick v. Thompson, 131 S.Ct.1350, 1360-61 (2011) (quoting Bd. of County Com'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 410 (1997)), the undersigned concludes that plaintiffs have failed to present *specific facts* sufficient to make Metro's deliberate indifference a genuine issue for trial. Moore v. Holbrook, 2 F.3d 697, 699 (6th Cir. 1993) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

Accordingly, the undersigned recommends that defendants' motion for summary judgment be GRANTED, and that plaintiffs' complaint against defendant Metropolitan Government of Nashville-Davidson County be DISMISSED.


## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that Defendants' motion for summary judgment be GRANTED, and that all claims against them be DISMISSED.

28

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 14th day of November, 2011.


                                          s/
                                        JOHN S. BRYANT
                                        UNITED STATES MAGISTRATE JUDGE

Case 3:10-cv-00746   Document 69   Filed 11/14/11   Page 29 of 29 PageID #: 810