# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MELISSA HEARRING, individually and   )
as natural mother and next friend of   )
B.H., a minor child,   )
   )
      Plaintiff,   )
   )
v.   )      CASE NO. 3:10-cv-00746
   )      JUDGE HAYNES
   )
   )
KAREN SLIWOWSKI, individually and   )
THE METROPOLITAN GOVERNMENT   )
OF NASHVILLE DAVIDSON COUNTY,   )
TENNESSEE,   )
   )
      Defendants.   )

## M E M O R A N D U M

Plaintiff, Melissa Hearring, as next friend of B.H., a minor, filed this action under 42 U.S.C. § 1983 against the Defendants: Karen Sliwowski, a school nurse who is sued in her individual capacity, and the Metropolitan Government of Nashville Davidson County, Tennessee ("Metro") that employed Sliwowski as a Metro school nurse. Plaintiff asserts a Fourth Amendment claim for the Defendant Sliwowski's visual search of B.H.'s labia without parental consent or medical emergency or other emergent circumstances. Plaintiff alleges that the Defendant Metro lacked any policy for strip searches of students that caused Sliwowski's visual search of B.H.'s labia without justification.

Before the Court is the Magistrate Judge's Report and Recommendation (Docket Entry No. 69), recommending that the Defendants' motion for summary judgment (Docket Entry No. 26) be granted and that Plaintiff's claims be dismissed. In sum, the Magistrate Judge concluded that B.H.'s Fourth Amendment right, as a minor to be free from a visual search of her labia by a school nurse who had concerns about B.H.'s medical condition, was not clearly established at the time of Sliwowski's visual search. (Docket Entry No. 69 at 21). Thus, the Magistrate Judge concluded that the qualified immunity doctrine bars any damages claims against Sliwowski. Id. The Magistrate Judge also concluded that Plaintiff's proof was insufficient to support a judgment on Plaintiff's Section 1983 claim against Metro. Id. at 26-28. Plaintiff has filed timely objections, and the Defendants filed their response.

Plaintiff asserts multiple objections to the Report and Recommendation that are, in sum: (1) that the Magistrate Judge failed to apply the "common sense" standard for qualified immunity test under Walker v. Davis, 649 F3d 502 (6th Cir. 2011); (2) that there were not any "legitimate health concerns" to justify Sliwowski's highly intrusive search of B.H.'s labia; (3) that based upon Plaintiff's expert proof, material factual disputes exist on whether a student search policy can be formulated that preclude an award of summary judgment to Metro; and (4) that the Magistrate Judge erroneously characterized Plaintiff's theory of Metro's liability, that is, despite an express state policy, Metro lacked any policy to provide guidance to Metro school nurses on student searches that caused the offensive search at issue in this action.

In response, Defendants contend that the Magistrate Judge correctly applied the applicable law to the undisputed facts and that his conclusion on Defendant Sliwowski's qualified immunity is correct. The Defendant Metro asserts that all school nurses are appropriately trained and Plaintiff's proof cannot establish the requisite showing of deliberate

2

indifference to impose Section 1983 liability on Metro. Moreover, Metro's proof is such a search policy is impossible for all possible searches.

For this Report and Recommendation and the objections thereto, the Court is required to conduct a de novo review. Fed. R. Civ. P. 72(b)(3).

## A. Review of the Record[1]

The Magistrate Judge's Report and Recommendation, found the following facts that are undisputed:

> In 2009, minor plaintiff B.H. was six years old and a student at Mt. View Elementary School—part of the Nashville Metropolitan School District. (Docket Entry No. 10 ¶ 4.) According to the record, B.H. had a history of bladder and urinary tract infections which would sometimes cause itching or discomfort to her genital area. ( Id. ¶¶ 4–5.)

> In late October of that year, B.H.'s mother, plaintiff Melissa Hearring, notified the school that B.H. was suffering from another bladder/urinary tract infection and was scheduled for an appointment with her physician on October 30. ( Id. ¶ 4.) On October 28, B.H.'s teacher called Ms. Hearring to inform her that B.H. had complained during class of itching and discomfort. ( Id. ¶ 5.) During the call, Ms. Hearring explained that such symptoms were consistent with B.H.'s condition and reminded the teacher of B.H.'s upcoming doctor's appointment. ( Id.)

> The next day, October 29, B.H. complained to her teacher again of pain and itching, and the teacher decided to escort B.H. to the school nurse's office a little before 2:00 p.m. (Docket Entry No. 33 ¶ 14.) However, because the nurse was administering medication to a diabetic student at the time, B.H. waited in the school secretary's office until the nurse was free. (Docket Entry No. 23 ¶¶ 6–7.)

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Based upon the qualified immunity ruling and the parties' evidence on professional standards, the Court concludes that material factual disputes exist to preclude an award of summary judgment. Thus, this section does not constitute findings of fact under Fed. R. Civ. P. 56(e).

The secretary, Pam Back, tried to reach Ms. Hearring by phone, but was unable to get th[r]ough to her and left Ms. Hearring a voice message instead. (Docket Entry No. 33 ¶ 16.)

The school nurse was defendant Karen Sliwowski. (Docket Entry No. 32 ¶ 2.) Defendant Sliwowski had been working as a registered nurse since 1996 (Docket Entry No. 23 ¶ 2.) and had been employed by the Metropolitan Public Health Department as a school nurse since November, 2008. (Docket Entry No. 32 ¶ 6.) Nurse Sliwowski worked at several different schools each day and did not arrive at Mt. View Elementary until around 2:00 p.m. on October 29. (Docket Entry No. 23 ¶ 5; Docket Entry No. 33–2, pg. 8, lines 11–21.)

After finishing her scheduled appointment with the diabetic student, Nurse Sliwowski took B.H. to the school health office to examine her. (Docket Entry No. 33 ¶ 14.) Ms. Back explained to Nurse Sliwowski that B.H. had come to the office complaining of pain and itching in her genital area, but Nurse Sliwowski was not aware at the time that B.H. was suffering from a urinary tract infection and did not inquire about B.H.'s medical history. (Docket Entry No. 33–1, pg. 15, line 23 through pg. 16, line 4.)

In order to examine B.H., Nurse Sliwowski took her to a restroom normally reserved for teachers. (Docket Entry No. 33 ¶ 14.) At Nurse Sliwowski's suggestion, Ms. Back accompanied them, so that someone would be present to observe the examination. ( *Id.*) In the restroom, Nurse Sliwowski asked B.H. to remove her pants and underwear and to squat down. ( *Id.*) She further asked B.H. to open her labia so that Nurse Sliwowski could inspect for any redness or irritation. ( *Id;* Docket Entry No. 23 ¶ 12.) Nurse Sliwowski did not touch B.H. during the course of this inspection and claims that she was never closer than one to two feet away. (Docket Entry No. 23 ¶ 12). Finding no redness or irritation, Nurse Sliwowski dismissed B.H. back to class. ( *Id.*)

After performing the examination, Nurse Sliwowski called Ms. Hearring, but was unable to reach her. (Docket Entry No. 33 ¶ 17.)

When she returned home after school on October 29, 2009, B.H. told her parents about Nurse Sliwowski's examination. (Docket Entry No. 10 ¶ 6). Plaintiffs assert that B.H. was "confused, humiliated, and frightened" by the experience. ( *Id.*)

The parties agree that Nurse Sliwowski received no training from the Metro Public Health Department concerning whether and under what circumstances examining a student's genitals is appropriate. ( *Id.* ¶¶ 10; Docket Entry No. 33–9 ¶ 1.) The next day, Nurse Sliwowski contacted her supervisor, Stephanie Blansett, to explain what had happened. (Docket Entry No. 24 ¶ 14.) On November 3, 2009, Ms. Blansett issued Nurse Sliwowski a written reprimand for failing to send a note home with B.H. as required by the School Health Clinical Manual in cases

when a nurse cannot reach a parent by phone. (Docket Entry No. 24–3.) The reprimand did not criticize Nurse Sliwowski for the examination itself, but did recommend that, in the future, Nurse Sliwowski consult with a supervisor "when you encounter an unfamiliar situation." ( *Id.*) Ms. Blansett further noted, however, that "[t]here is no question as to your good intentions in this situation. I have no doubt, nor does our director, that you only wanted to help this student receive the appropriate care." ( *Id.*)

(Docket Entry No. 69, Report and Recommendation at 2-4).

In her objections, Plaintiff cites additional proof that Sliwowski stated that she had not observed B.H. "walking funny," but she wanted to make sure that B.H. "did not have an injury that I needed to be aware or something that would require emergency care." (Docket Entry No. 33, Exhibit 10, Cosby Rule 26 Statement at 5; Exhibit 2, Sliwowski Deposition at pp. 9, 12). According to Sliwowski, "child abuse was not my concern in my head when I saw the student." Id.; Exhibit 2 at p. 19. Sliwowski stated that she "could not diagnose" a urinary tract infection by her visual examination of B.H.'s labia. Id. at Exhibit 2 at pp. 19-20. As to whether Sliwowski's actions were correct, Sliwowski's nursing supervisor replied "No." (Docket Entry No. 33, Exhibit 5, Blansett Deposition at pp. 22-23).

Sliwowski did not know if parental permission were necessary to conduct a genital examination of a Metro public school student. Id., Exhibit 10, at 6; Exhibit 1, Sliwowski Deposition at p. 9. Sliwowski lacked access to B.H.'s medical records and citing patient confidentiality, Sliwowski did not request Pam Back, the school secretary who observed Sliwowski's examination, if B.H. had prior physical problems. Id.; Exhibit 1 at p. 15; Exhibit 2 at pp. 13, 17. Sliwowski also did not make a written record of her examination that is required for a clinic visit nor did Sliwowski send a note home with B.H. after the examination, as required. Id., Exhibit 1 at pp. 10-12, 22-23. According to Kimberly Fowler, the school principal, the school must inform the school nurse of "information that would be beneficial to the nurse

and appropriate because as a school we are acting in loco of the parent." Id., Exhibit 6, Fowler Deposition at p. 6.

Plaintiff also cites the expert testimony of Mariann Cosby, a registered nurse, who agreed that Sliwowski could not diagnose a urinary tract infection by examining the child's labia. (Docket Entry No. 33, Exhibit 10 at 5, 10-12). Cosby cites Sliwowski's failures: to document her examination of B.H.; to question B.H.; and to check B.H.'s vital signs, temperature, pulse, respirations and blood pressure. Id. at 10-11. These latter measures provide objective data for a diagnosis of a possible urinary tract infection. Id. at 8. Cosby cites Sliwowski's statement that her examination of B.H.'s labia would not have provided any insight of whether B.H. had a urinary tract infection, id. at 5; Exhibit 2 at pp. 19-20. In Cosby's opinion, Sliwowski's examination of B.H.'s labia was improper medical treatment by a school nurse.

> **According to NASN's *School nursing: A Comprehensive Text*, those cases where urinary tract infection is suspected, subjective and objective data the school nurse should collect includes the following: Subjective data includes asking the student to describe the discomfort and whether there appears to be blood in the urine. Objective data includes checking for a fever by taking a temperature. Similarly if vaginal discharge is suspected, the school nurse should ask age appropriate questions about the symptoms, make age appropriate observations, and evaluate for signs of fever or underlying systemic disease via history.**

> * * *

> **It is my opinion that Nurse Sliwowski's omission of attempting to obtain subjective and objective data from the various resources as part of the assessment process, was a critical departure from the practice of nursing in a school setting and contributed to her flawed thinking and nursing judgment.**

> **She sidestepped critical elements of the nursing process without giving consideration to her actions. She failed to document any aspect of the incident. She did the visual examination without sound rationale. She did so with disregard for the outcome or the potential ramifications. She did so, without considering the rights of the student or the parent.**

> Therefore, it is my opinion that the visual inspection of B.H.'s genital area and the opening of her labia was not indicated nor appropriate under the specific circumstances of this case. Nurse Sliwowski should have known that this type of examination was not indicated since child abuse was not suspected and there was no emergency. She should have known that since there was no emergency, implied consent was not applicable. Consistent with parental consent rights regarding health screenings and health care procedures, she should have known that parental permission was needed.

(Docket Entry No. 33, Exhibit 10 at 8, 12, 13) (emphasis added).

Cosby also cites national and Tennessee educational standards for school nurses that restrict medical examinations of students and prohibit a genital examination of a student absent parental consent or a medical emergency.

> [NASN's *School nursing: A Comprehensive Text*] states, "physical assessment of the genital region is not usually performed in the school setting." Although not cited in the evidence as one of the resources for school nurses serving the Metropolitan Nashville Public Schools, it is a nationally recognized school nursing resource and is readily available to school nurses.

> According to another nationally recognized resource by NASN, *Quality Nursing Intervention In the School Setting*, even in those cases where sexual abuse might be suspected, a "physical inspection of the genital area is generally not done unless there are subjective and objective indicators of emergent bleeding."

> The *2007 Guidelines for the Use of Health Care Professionals and Health Care Procedures In a School Setting*, defines an emergency as "a serious situation that arises suddenly and threatens the life, limb, or welfare of one or more persons; a crisis." "An emergency creates a type of implied consent when the individual is unable to consent to treatment that is immediately necessary." Nurse Sliwowski's immediate supervisor, Stephanie Blansett RN, testified that based on her review of this definition and both Nurse Sliwowski's and Pam Back's November 2, 2009 statements, this definition of an emergency did not fit the writings. Further, she testified that based on the writings alone, she "would not draw the conclusion from these words that there was an emergency." Once again, Nurse Sliwowski testified that she had heard of this resource, but she never read or reviewed it.

**The *2007 Guidelines for Use of Health Care Professionals and Health Care Procedures in a School Setting* also defines parental consent as: "written consent from a parent/guardian that is required before a student can be administered medication or be a recipient of health care procedures in a school setting."** Parental consent is also discussed in the ***Tennessee Department of Education School Health Screenings Guidelines.*** This resource **addresses the fact that parental permission is needed in order for the school to perform the vision, hearing, scoliosis and other health screenings that are typically done by school nurses.**

Id. at 8-9.

Metro's expert proof on the training of school nurses is that nurse training is provided to Metro school nurses who also have school administrators as supervisors and a nurse mentor, but a policy on student searches is "impossible" to define for all circumstances. (Docket Entry No. 36, Bergren Declaration at ¶ 5b-e, i-l). Martha Dewey Bergren, who has a doctorate in nursing and is Metro's expert, states that:

> 3. I was asked by the Metropolitan Government of Nashville and Davidson County to evaluate the School Nurse Program operating in the Metropolitan Nashville Public Schools.

> 4. I reviewed the materials listed in Exhibit 2 in formulating my opinion in this case.

> 5. Based upon my review of the materials listed in Exhibit 2, my education, and experience, I offer the following expert opinions:

>> a. Metropolitan Nashville Public Schools follow the norm in hiring experienced registered nurses for school nurse positions. The hiring of experienced registered nurses is standard for school districts across the United States. School nursing is an independent practice and the school setting is not amenable to a new nursing graduate lacking clinical experience.

>> b. In a poll conducted by the National Association of School Nurses in 2010, 6% of school nurses reported having a formal orientation to their school nurse position and 10% reported having a scripted orientation with a nurse mentor. Twenty-three percent of school nurses reported their state holds a generic orientation to the school nurse role. Thirty-six percent of school nurses reported they received no orientation to their current position.

c.  The orientation of school nurses for the Metropolitan Nashville Public Schools exceeds the length and breadth of the average school nurse orientation program in the United States. It is a systematic month long, comprehensive program. Each orientee is provided an experienced mentor and written policies and procedures to guide practice. The content covered by the program is documented.

d.  **School nurses typically are not supervised by a health professional in the school setting. School nurses are most often supervised by an educational administrator.**

e.  In a poll in 2009, 69% of school nurse respondents reported that their supervisor was a non-nurse. The Metropolitan Nashville Public Schools provide school nurses with seasoned school health registered nurse mentors upon hire and are supervised by a master's prepared registered nurse.

f.  The Metropolitan Nashville Public Schools provide a typical assortment of published reference materials for school nurses. The combined reference materials provide a comprehensive set of guidelines for school nursing practice.

g.  **Physical assessment is an integral part of the registered nurse role** —the four step nursing process is assess, plan, implement and evaluate. Physical assessment is a basic nursing skill that is taught in the entry level nursing courses prior to graduation and taking the licensure exam.

h.  In none of the school districts that I served as a school nurse was there a policy barring certain aspects of a physical examination of a student who reports a physical complaint. I am not aware of any school nursing orientation programs that review conducting physical exams.

i.  **In a school nurse orientation program or a school health policy manual, it is impossible to cover every situation that a school nurse will encounter in the course of a day, week, month or year.** School nurses are responsible for a large number of students whose age and developmental level range from Pre-K to 12th grade. Many of the students the nurses serve endure multiple social and economic disadvantages and suffer from a wide array of health conditions, both chronic and emergent.

j.  It is prudent of the Metropolitan Nashville Public Schools to provide each nurse with a mentor and a nursing supervisor to provide guidance for the many circumstances that arise over a nurse's career that cannot be anticipated in orientation.

    k. By hiring experienced registered nurses, they target nursing personnel who have the judgment needed for ever changing demands and situations. **It is not the norm for school districts to have policies that specify or prohibit specific aspects of assessments.** It is not the norm that this type of distinction be included in a school nursing orientation at either the district or state level.

    l. **The Metropolitan Nashville Public Schools provide school nurses with a comprehensive orientation and skilled health professional supervision that exceeds the United States norm.**

(Docket Entry No. 36, Bergren Declaration at 1-4)(emphasis added). Stephanie Blansett, a Metro nurse supervisor, provides essentially the same description of the training and supervision of Metro school nurses. (Docket Entry No. 24, Blansett Declaration at 1-3).

## B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment <u>sua sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). <u>Accord</u>, <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But see Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's

burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

* * *

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'</u>

<u>Liberty Lobby</u>, 477 U.S. at 248, 252, 106 S. Ct. 2505, 91 L.Ed.2d at 211-212, 214 (citation omitted and emphasis added).

It is likewise true that

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d. 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule

13

56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Here, the parties have given some references to the proof upon which they rely.

Local Rule 56.01(b) and (c) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.3. The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element

of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.    The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.    The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.    The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment:  (1) has the moving party "clearly and convincingly" established the absence of material facts?;  (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

### 1. The Qualified Immunity Analysis

The qualified immunity doctrine involves "a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." Wyatt v. Cole, 504 U.S. 158, 167 (1992). The Sixth Circuit articulated the rationale for qualified immunity as follows:

Qualified immunity accommodates two important competing interests. On the one hand, an action for damages may be "the only realistic avenue for vindication of constitutional guarantees" where officials violate the public trust. Harlow, 457 U.S. at 814, 102 S.Ct. at 2736. **Yet, the "threat of liability can create perverse**

**incentives that operate to inhibit officials in the proper performance of their duties.**" Forrester v. White, [484] U.S. [219], 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988) (emphasis in original).

* * *

"[P]ermitting damage suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." Harlow, 457 U.S. at 814, 102 S.Ct. at 2736 ("These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office."). Thus, government officials must be given some assurance that they can perform their duties without fear of monetary liability or the diversions inherent in litigation. The doctrine of qualified immunity seeks to achieve this salutary goal. The doctrine reflects the belief "that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984).

Poe v. Hayden, 853 F.2d 418, 423 (6th Cir. 1988) (emphasis added).

This doctrine has been addressed in a series of decisions, Wood v. Strickland, 420 U.S. 308 (1975); Procunier v. Navarette, 434 U.S. 555 (1978); Anderson v. Creighton, 483 U.S. 635 (1987), that essentially establishes a two-step analysis that the Supreme Court described in Siegert v. Gilley, 500 U.S. 226 (1991):

We have on several occasions addressed the proper analytical framework for determining whether a plaintiff's allegations are sufficient to overcome a defendant's defense of qualified immunity asserted in a motion for summary judgment. Qualified immunity is a defense that must be pleaded by a defendant official. Harlow, 457 U.S. at 815, 73 L.Ed.2d 396, 102 S.Ct. 2727. Once a defendant pleads a defense of qualified immunity, "[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. . . . Until this threshold immunity question is resolved, discovery should not be allowed." Id. at 818, 102 S.Ct. 2727, [73 L.Ed.2d 396].

* * *

In Harlow we said that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." Harlow, supra, at 818, 102 S.Ct. at 2738 (emphasis added). **A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.** Decision of this purely legal question

> permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits.

Id. at 231-32 (emphasis added).

In Wilson v. Layne, 526 U.S. 603, 609 (1999), the Supreme Court expressly stated that courts "must first determine whether the plaintiff has alleged the deprivation of a constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the violation." In 2001, the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001) stated: "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established." 533 U.S. at 201 (citing Siegert, 500 U.S. at 232).

After criticisms of some circuits and others, the Supreme Court has since held that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). In doing so, the Court recognized that in some instances, unnecessary costs can be imposed under the Saucier test. In deciding to forego the first step of Saucier's analysis, the Magistrate Judge referred to those costs in declining to address both steps in the qualified immunity analysis. (Docket Entry No. 69  Report and Recommendation at 6-7 citing "Judges Sutton and Gibbons of the Sixth Circuit openly question[ing] the 'rigidity' of Saucier's requirements and whether it makes sense to

force lower courts to answer the constitutional questions first 'no matter the costs, no matter the ease with which the second question might be answered.'") (internal citations omitted).

In Pearson, the Supreme Court identified those costs concerns that may warrant the declination of the two-step analysis:

> As a result, **several courts have identified an "exception" to the Saucier rule for cases in which resolution of the constitutional question requires clarification of an ambiguous state statute**. Egolf v. Witmer, 526 F.3d 104, 109–111 (3rd Cir. 2008); accord, Tremblay v. McClellan, 350 F.3d 195, 200 (1st Cir. 2003); Ehrlich v. Glastonbury, 348 F.3d 48, 57–60 (2d Cir. 2003). Justifying the decision to grant qualified immunity to the defendant without first resolving, under Saucier's first prong, whether the defendant's conduct violated the Constitution, **these courts have observed that Saucier's "underlying principle" of encouraging federal courts to decide unclear legal questions in order to clarify the law for the future "is not meaningfully advanced ... the precise factual basis for the plaintiff's claim or claims may be hard to identify. . . .**
>
> **[B]riefing of constitutional questions is woefully inadequate.** See Lyons, supra, at 582 (Sutton, J., concurring)
>
>           \*   \*   \*
>
> **Where a court holds that a defendant committed a constitutional violation but that the violation was not clearly established, the defendant may face a difficult situation. As the winning party, the defendant's right to appeal the adverse holding on the constitutional question may be contested.**
>
>           \*   \*   \*
>
> **Adherence to Saucier's two-step protocol departs from the general rule of constitutional avoidance and runs counter to the "older, wiser judicial counsel 'not to pass on questions of constitutionality ... unless such adjudication is unavoidable.' "** Scott, 550 U.S., at 388.

Id., at 238, 239, 240, 241.

Later, in Camreta v. Greene, 131 S.Ct. 2020 (2011), the Supreme Court eliminated one cost concern in adopting a policy to consider an appeal to that court by a winning party on a qualified immunity ruling. The Supreme Court's rationale included that:

> We think just such a reason places qualified immunity cases in a special category when it comes to this Court's review of appeals brought by winners. The constitutional determinations that prevailing parties ask us to consider in these cases

are not mere dicta or "statements in opinions." Rooney, 483 U.S., at 311, 107 S.Ct. 2852 (internal quotation marks omitted); see Bunting, 541 U.S., at 1023, 124 S.Ct. 1750 (SCALIA, J., dissenting from denial of certiorari) (stating that such a determination is " not mere dictum in the ordinary sense"). **They are rulings that have a significant future effect on the conduct of public officials—both the prevailing parties and their co-workers—and the policies of the government units to which they belong. See supra, at 2028 – 2030. And more: they are rulings self-consciously designed to produce this effect, by establishing controlling law and preventing invocations of immunity in later cases. And still more: they are rulings designed this way with this Court's permission, to promote clarity—and observance—of constitutional rules. We describe in more detail below these features of the qualified immunity world and why they came to be. We hold that taken together, they support bending our usual rule to permit consideration of immunized officials' petitions.**

* * *

But we have long recognized that this day may never come—**that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo**... Indeed, for some time we *required* courts considering qualified immunity claims to first address the constitutional question, so as to promote "the law's elaboration from case to case." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). More recently, we have left this matter to the discretion of lower courts, and indeed detailed a range of circumstances in which courts should address only the immunity question. See Pearson, 555 U.S., at 236–242, 129 S.Ct. 808. In general, courts should think hard, and then think hard again, before turning small cases into large ones. But it remains true that following the two-step sequence— defining constitutional rights and only then conferring immunity-is sometimes beneficial to clarify the legal standards governing public officials.

Id. at 2030, 2031-32 (emphasis added).

Moreover, despite its recognition of cost concerns, the Supreme Court in Pearson reiterated

the value of Saucier's two-step process.

Although we now hold that the Saucier protocol should not be regarded as mandatory in all cases, **we continue to recognize that it is often beneficial. For one thing, there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the "clearly established" prong. "[I]t often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be."** Lyons v. Xenia, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring). In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all. In addition, **the Saucier Court**

**was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.**

555 U.S.at 236.[2]

The Court respectfully concludes that here the circumstances and the cited cost concerns do not counsel avoidance of Saucier's two step test. First, the parties have completed discovery and developed a full factual record of the controversy. Second, there are not any unsettled or ambiguous state law issues. Third, with the Magistrate Judge's legal analysis, the parties' memoranda and responses to the Report and Recommendation, the issues are well briefed. Fourth, the determination of the first step of the Saucier test is akin to ruling on a motion to dismiss for failure to state a claim that courts often do. Fifth, with any qualified immunity ruling, there is an immediate appeal as of right to the aggrieved party. Moreover, as described in Camreta, here, uncertainty exists on whether the Fourth Amendment protects a public school student from highly invasive searches without parental consent or a bona fide medical emergency. This uncertainty is in the context of likely recurring controversies, given Metro's expert proof that in Metro schools "Physical assessment is an integral part of the registered nurse['s] role." (Docket Entry No. 36, Bergren Declaration at ¶ 5g). An application of Saucier's two step analysis can provide some guidance for school nurses in future cases aside from the resolution of Sliwowski's qualified immunity defense.

Moreover, as the Supreme Court has repeatedly observed: "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the

---

[2] "The empirical data proves that mandatory *Wilson-Saucier* sequencing is necessary to ensure robust articulation of constitutional rights." Paul W. Hughes, *Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights*, 80 U Colo. L. Rev. 401, 420 (2009). A corollary to that finding is that failure to articulate whether a constitutional right exists tends to expand the exercise of governmental authority over a person.

time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all," Siegert, 500 U.S. at 232, and that "'it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be.'" Pearson, 555 U.S. at 236 (quoting Lyons v. Xenia, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)).

Finally, on this issue, a prerequisite for Metro's liability is a determination of whether Sliwowski's acts violated Plaintiff's federal rights. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.") (emphasis in original).

The Court fails to discern here any costs considerations that counsel against the application of Saucier's two step analysis. Under these circumstances, the Court concludes that conducting the Saucier two step analysis is appropriate.

### 2. The Fourth Amendment Right

As to whether B.H. has a Fourth Amendment right to be free from a visual search of her labia, the Court reviews Fourth Amendment precedents that specifically address searches of public school students, including case law on physical examinations of public school students.

In New Jersey v. T.L.O., 469 U.S. 325, 338 (1985), involving a search of a 14 year old female's purse for cigarettes, the Supreme Court stated: "**A search of a child's person** or of a closed purse or other bag carried on her person ... **is undoubtedly a severe violation of subjective expectations of privacy.**" In Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646 (1995), the Supreme Court set Fourth Amendment standards for urine drug testing of public school students absent individual suspicion. The Vernonia Court upheld a school's system policy of randomly drug testing

student athletes even in the absence of individualized suspicion based upon: (1) the "nature of the privacy interest upon which the search . . . intrudes" that society recognizes as "legitimate", (2) "the character of the intrusion that is complained of", and (3) "the nature and immediacy of the governmental concern at issue." Id. at 654,658, 660.  In Vernonia, the Court concluded that as student athletes, the tested students had a decreased expectation of privacy given their voluntary participation in sports; that the students were clothed and were not observed while providing the urine sample; and that deterrence of drug use by students was an important, if not compelling interest. Id. at 654-65.

In Safford Unified School Dist. No. 1 v. Redding, ___ U.S. ___ , 129 S. Ct. 2633 (2009), decided on June 25, 2009, more than four months[3] prior to the search of B.H., the Supreme Court held that school officials' search for pills that involved a strip search of a 13 year old middle school student, including "exposing her breasts and pelvic area to some degree" violated the student's Fourth Amendment rights. Id. at 2638.

> The exact label for this final step in the intrusion is not important, though strip search is a fair way to speak of it. Romero and Schwallier directed Savana to remove her clothes down to her underwear, and then "pull out" her bra and the elastic band on her underpants. Id., at 23a. Although Romero and Schwallier stated that they did not see anything when Savana followed their instructions, App. to Pet. for Cert. 135a, we would not define strip search and its Fourth Amendment consequences in a way that would guarantee litigation about who was looking and how much was seen. **The very fact of Savana's pulling her underwear away from her body in the presence of the two officials who were able to see her necessarily exposed her breasts and pelvic area to some degree, and both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings.**

---

[3] Although in a different statute, but with a similar phrase, the Supreme Court held that its constitutional decisions are "clearly established federal law" under the federal habeas statute when its decision is rendered before the federal habeas claim is finally adjudicated in the state courts. Greene v. Fisher, _ U.S. _, _ S. Ct. _, 2011 WL 5335411 at *2 (2011).

**Savana's subjective expectation of privacy against such a search is inherent in her account of it as embarrassing, frightening, and humiliating. The reasonableness of her expectation (required by the Fourth Amendment standard) is indicated by the consistent experiences of other young people similarly searched, whose adolescent vulnerability intensifies the patent intrusiveness of the exposure.** See Brief for National Association of Social Workers et al. as Amici Curiae 6-14; Hyman & Perone, The Other Side of School Violence: Educator Policies and Practices that may Contribute to Student Misbehavior, 36 J. School Psychology 7, 13 (1998) (strip search can "result in serious emotional damage"). The common reaction of these adolescents simply registers the obviously different meaning of a search exposing the body from the experience of nakedness or near undress in other school circumstances. Changing for gym is getting ready for play; exposing for a search is responding to an accusation reserved for suspected wrongdoers and fairly understood as so degrading that a number of communities have decided that strip searches in schools are never reasonable and have banned them no matter what the facts may be, see, *e.g.,* New York City Dept. of Education, Reg. No. A-432, p. 2 (2005), online at http:// docs. nycenet. edu/ docushare/dsweb/Get/Document-21/A-432.pdf ("Under no circumstances shall a strip-search of a student be conducted").

**The indignity of the search does not, of course, outlaw it, but it does implicate the rule of reasonableness as stated in T.L.O., that "the search as actually conducted [be] reasonably related in scope to the circumstances which justified the interference in the first place."** 469 U.S., at 341, 105 S.Ct. 733 (internal quotation marks omitted). **The scope will be permissible, that is, when it is "not excessively intrusive in light of the age and sex of the student and the nature of the infraction."** *Id.,* at 342, 105 S.Ct. 733.

\* \* \*

**In sum, what was missing from the suspected facts that pointed to Savana was any indication of danger to the students from the power of the drugs or their quantity, and any reason to suppose that Savana was carrying pills in her underwear. We think that the combination of these deficiencies was fatal to finding the search reasonable.**

Id. at 2641, 2642-43 (emphasis added).

In this Circuit in 1984, the late Honorable Harry Phillips, a distinguished jurist from Tennessee, authored Tarter v. Raybuck, 742 F.2d 977, 979-80 (6th Cir. 1984) that addressed school officials directing a high school student to submit to a search of his person by removing his shirt and pants. The Sixth Circuit stated:

We hold that a school official or teacher's reasonable search of a student's person does not violate the student's fourth amendment rights, if the school official has reasonable cause to believe the search is necessary in the furtherance of maintaining school discipline and order, or his duty to maintain a safe environment conducive to education. *Cf.* Horton v. Goose Creek, supra, 690 F.2d at 480; State in the Interest of T.L.O., supra, 463 A.2d at 941; State v. McKinnon, 88 Wash.2d 75, 81, 558 P.2d 781, 784 (1977) (search reasonable if school official has reasonable grounds to believe search is necessary in the aid of maintaining school discipline and order). We note that not only must there be a reasonable ground to institute the search, the search itself must be reasonable. **Thus, for example, the authority of the school official would not justify a degrading body cavity search of a youth in order to determine whether a student was in possession of contraband in violation of school rules. There the fourth amendment and privacy interests of the youth would clearly outweigh any interest in school discipline or order which might be served by such a search.** In Doe v. Renfrow, 631 F.2d 91, 92–93 (7th Cir.1980) cert. denied, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) the court noted: **"[i]t does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency." "We suggest as strongly as possible that the conduct herein described exceeded the 'bounds of reason' by two and a half country miles."** 631 F.2d at 93.

Id. at 982-83 (emphasis added).

Later, in Beard v. Whitmore Lake School Dist., 402 F.3d 598 (6th Cir. 2005) public school officials searched 25 high school students for stolen money that included 15 female students who had to pull up their shirts and pull down their pants, but were never touched and were not required to remove their underwear. Id. at 602. The Sixth Circuit held:

**The scope of the searches in the instant case, however, viewing the facts in the light most favorable to the plaintiffs, does not pass constitutional muster. . . .**

. . . .

In light of the factors set forth in *Vernonia,* the searches performed on the male students in this case were in violation of the Fourth Amendment. First, the privacy interest here was great. Students of course have a significant privacy interest in their unclothed bodies. *See* T.L.O., 469 U.S. at 337-38, 105 S.Ct. 733 (noting that a "search of a child's person ... is undoubtedly a severe violation of subjective expectations of privacy")... However, the scope of the search did exceed what would normally be expected by a high school student in a locker room. As alleged by the

24

plaintiffs, the boys were individually and directly examined as they unclothed. Moreover, **unlike in *Vernonia*, the students did not "voluntarily subject themselves to a degree of regulation ... higher than that imposed on students generally."** 515 U.S. at 657. . . .

**Second, the character of the intrusion was far more invasive than the character of the urinalyses in *Vernonia*, where students remained fully clothed.** Also unlike in *Vernonia*, the searches were likely to disclose much more than the limited information (presence of drugs) at issue in *Vernonia*. **The boys were required to lift their shirts and to remove both their pants and underwear**.

. . . .

**The highly intrusive nature of the searches, the fact that the searches were undertaken to find missing money, the fact that the searches were performed on a substantial number of students, the fact that the searches were performed in the absence of individualized suspicion, and the lack of consent, taken together, demonstrate that the searches were not reasonable. Accordingly, under *T.L.O.* and *Vernonia*, the searches violated the Fourth Amendment.**

Id. at 604-05.

In Brannum v. Overton County School Board, 516 F.3d 489 (6th Cir. 2008), the Sixth Circuit

held videotaping middle school age male and female athletes in various stages of undressing in a

school locker-room violated the students' Fourth Amendment rights. The Sixth Circuit found:

In Beard, we considered the constitutionality of a strip search conducted by the school officials when a student reported that she was missing some money. The male and female students were separated and taken to different places in the school. The female students, while in full view of the others and the school officials, were required to lift up their shirts and pull down their pants without removing their undergarments. The males, on the other hand, were forced to remove their outer clothing and pull down their undergarments for inspection by the school official. We found that the character and scope of this search was unreasonably intrusive upon the students' privacy. Beard, 402 F.3d at 605-06.

In this case, the scope of the search consisted of the video recording and image storage of the children while changing their clothes. In Vernonia, procedural safeguards were put into place to protect the students' privacy, but in this case, the school officials wholly failed to institute any policies designed to protect the privacy of the students and did not even advise the students or their parents that students were being videotaped. Likewise, as the female students in Beard were inspected while in their undergarments, the students here were also observed in their

25

undergarments while they were in the school locker rooms. We believe that the scope of the secret surveillance in this case, like the strip search in Beard, significantly invaded the students' reasonable expectations of privacy.

\* \* \*

**Given the universal understanding among middle school age children in this country that a school locker room is a place of heightened privacy, we believe placing cameras in such a way so as to view the children dressing and undressing in a locker room is incongruent to any demonstrated necessity, and wholly disproportionate to the claimed policy goal of assuring increased school security, especially when there is no history of any threat to security in the locker rooms.**

\* \* \*

**Some personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion. Surreptitiously videotaping the plaintiffs in various states of undress is plainly among them. See Poe v. Leonard, 282 F.3d 123, 138-39 (2d Cir.2002); see also York v. Story, 324 F.2d 450, 455.(9th Cir.1963).**

\* \* \*

**We therefore conclude that the plaintiffs have adequately alleged a Fourth Amendment violation of their constitutional right to privacy because the students had a reasonable expectation of privacy and the invasion of the students' privacy in this case was not justified by the school's need to assure security.**

Id. at 497, 498, 499.

As to whether, under these decisions, Plaintiff states a Fourth Amendment violation for the search of B.H., the Court concludes that the nature of the privacy interest here, the exposure of a 6 year-old girl's labia, is far greater than the students' privacy interests in T.L.O., Safford, Beard and Brannum. The nature of the search was B.H.'s pulling down her pants and underwear as well as the separation of her vaginal area before a nurse and also a school official that resulted in embarrassment and humiliation to B.H. There is proof that this search was without a medical justification or emergency, without parental consent and was contrary to professional and state

standards for public school nurses. Based upon these decisions and facts, the Court concludes that Plaintiff states and proves a violation of B.H.'s Fourth Amendment right to be free from such invasive and unjustified searches of her person by a public school nurse.

The Magistrate Judge also cited the "special needs" doctrine as justifying Sliwowski's search, as a school nurse inquiring about the need for possible medical treatment. (Docket Entry No. 69, Report and Recommendation at 12-13) (Sliwowski "was not trying to prevent an imminent injury when she examined B.H. Instead, Nusre Sliwowski was trying to determine what medical care, if any, B.H. required for her existing medical condition").[4]

The "special needs" doctrine applies where an important governmental interest justifies excusing the probable cause requirement of the Fourth Amendment, Ferguson v. City of Charleston, 532 U.S. 67, 76 n.7 (2001), or where compliance with Fourth Amendment standards is "impracticable." Bd. of Educ. of Independent School Dist. No.92 of Pottawatomie County v. Earls, 536 U.S. 822, 829 (2002) (drug testing of middle and high school students). In T.L.O., the Supreme Court recognized that school officials act *in loco parentis* for school children and "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause." 469 U.S. at 341.

In Dubbs v. Head Start, Inc., 336 F.3d 1194 (10th Cir. 2003), the Tenth Circuit considered this special needs doctrine in the context of genital examinations of pre-school students who were subjected to such searches. There, the school employed an agency to conduct health examinations,

---

[4]This language suggests Sliwowski's good faith, but for qualified immunity under the Fourth Amendment, there must be "objective good faith", not subjective good faith, Graham v. Connor, 490 U.S. 386, 399 n. 12 (1989). Based upon Plaintiff's expert proof, material factual disputes exist on whether under national and state standards for school nurses, Sliwowski acted in "objective good faith." Id.

but the agency had to secure parental permission for such examinations. The district court ruled that the students' Fourth Amendment rights were violated given the absence of a medical emergency or parental consent. The Tenth Circuit held that the special needs doctrine did not apply because there was not any showing that securing a parent's consent was impracticable. Id at 1214-15. The Tenth Circuit explained that

> **It should go without saying that adequate consent is elemental to proper medical treatment. In medical procedures involving children, ensuring the existence of parental consent is critical, because children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care. American Academy of Pediatrics, *Informed Consent, Parental Permission, and Assent in Pediatric Practice,* 95 Pediatrics 314–17 (February, 1995).**

> **Even beyond constitutional values of privacy, dignity, and autonomy, parental notice and consent for childhood physical examinations are of significant practical value.** Because of CAP's failure to notify parents in advance of the examinations, **no parents were present to provide medical histories, discuss potential issues with the health care professionals, help to explain the procedures to the children, and reassure them about the disturbing and unfamiliar aspects of the exam—which included blood-letting, which is painful, as well as visual and sometimes tactile inspection of genitals by strangers. At least half of the plaintiff children were subjected to a duplicative exam by unfamiliar health care professionals in a makeshift setting, even though they had already obtained exams from their own doctors. These practical consequences might well have been averted by more careful attention to the children's Fourth Amendment rights.**

> **Accordingly, we agree with the district court's conclusion that the physical examinations performed by the defendants in this case constituted "searches" within the meaning of the Fourth Amendment, and thus were unconstitutional unless they were performed with warrant or parental consent, or fall within the "special needs" exception to the warrant requirement.**

Id. at 1207 (emphasis added).

Under the facts here, the trier of fact could reasonably find the lack of any objective facts of a medical necessity justifying this search of B.H.'s labia nor facts of a medical emergency. Plaintiff's expert proof is that Sliwowski did not use any objective measures to assess whether B.H.

had an illness. Based upon Plaintiff's expert testimony, the trier of fact could find that Sliwowski breached national and state standards prohibiting such genital searches without parental approval or a medical emergency thereby rendering this search unreasonable. Thus, the Court agrees with Dubbs and concludes that the special needs doctrine cannot justify this search of B.H.

### 3. The "Clearly Established Right" Analysis

As to whether B.H.'s Fourth Amendment right was clearly established at the time of Sliwowki's search, the Supreme Court has not specified its test for a "clearly established right." See Harlow v. Fitzgerald, 457 U.S. 800, 818 n. 32 (1982). The Sixth Circuit adopted the following test: "In order to be clearly established, a question must be decided either by the highest state court in the state where the case arose, by a United States Court of Appeals, or by the Supreme Court." Robinson v. Bibb, 840 F.2d 349, 351 (6th Cir. 1988) (citation omitted). Later, the Sixth Circuit included district court decisions within the district of the controversy: "Our review of the Supreme Court's decisions and of our own precedent leads us to conclude that, in the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its Court of Appeals **or itself**". Ohio Civil Serv. Employees Assn. v. Seiter, 858 F.2d 1171, 1177 (6th Cir. 1988) (emphasis added). The consideration of other circuits' decisions, however, is limited.

> **"In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law**. For the decisions of other courts to provide such 'clearly established law,' these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting. Here a mere handful of decisions of other circuits and district courts, which are admittedly novel, cannot form the basis for a clearly established right in this circuit.

Id. at 1177-78; accord Lavado v. Keohane, 992 F.2d 601, 606 (6th Cir. 1993) (explaining that the resort to decisions of other courts arises only "in an extraordinary case.").

Plaintiff cites <u>Walker v. Davis</u>, 649 F.3d 502 (6th Cir. 2001) where the Sixth Circuit denied

the qualified immunity defense involving a Fourth Amendment claim by citing the general Fourth

Amendment right that absent an immediate threat, an officer could not resort to the use of deadly

force by ramming a suspect's vehicle. <u>Id</u>. at 503-04. The Sixth Circuit ruled that the issue of the

officer's intent was for the jury. <u>Id</u>. As to the qualified immunity issue, the Sixth Circuit stated:

> Nor does it matter that, at the time of Davis's actions, there were few, if any, reported cases in which police cruisers intentionally rammed motorcycles. **It is only common sense-**and obviously so- that intentionally ramming a motorcycle with a police cruiser involves the application of potentially deadly force. **This case is thus governed by the rule that "general statements of law are capable of giving clear and fair warning to officers even where the very action in question has not previously been held unlawful."**

<u>Id</u>. (quoting <u>Smith v. Cupp</u>, 430 F.3d 766, 776-77 (6th Cir. 2005) (emphasis added, internal marks

omitted)).

In <u>T.L.O.</u>, the Supreme Court expressly stated that "[a] **search of a child's person … is**

**undoubtedly a severe violation of subjective expectations of privacy.**" 469 U.S. at 379. Here,

more than four months prior to Sliwowski's search, the Supreme Court held that causing a female

student to expose her breasts and pelvic area in search of drugs violated that student's Fourth

Amendment right to privacy. <u>Safford Unified School Dist.</u>, 129 S.Ct. at 2641-2643.

Based upon the Sixth Circuit decisions discussed <u>supra</u>, the Sixth Circuit addressed whether

"strip searches" of high school students in a nursing class in 2005 for a lost credit card violated a

clearly established right. <u>Knisley v. Pike County Joint Vocational School</u>, 604 F.3d 977 (6th Cir.

2010). There, the Sixth Circuit stated:

> **[T]his Circuit's law on student strip searches was clearly established as early as 2005, when we published our opinion in <u>Beard</u>. We read <u>Redding</u> to affirm our constitutional holding in <u>Beard</u>. Thus, because <u>Beard</u> remains good constitutional law and because that law was clearly established at the time of the strip search in this case,** <u>Redding</u> does not require a result contrary to that reached in <u>Knisley</u> I. Cf. <u>Foster v. Raspberry</u>, 652 F.Supp.2d 1342, 1352 (M.D.Ga.2009). Our

Circuit's clearly established case law on this issue put the school and its employees on notice that this search was unconstitutional, so defendants are not entitled to qualified immunity protection.

Id. at 982-83 (emphasis added).

In Tarter, although the Sixth Circuit found the searches reasonable, the Court approvingly quoted a Seventh Circuit decision that: "'[i]t does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency.'" "'We suggest as strongly as possible that the conduct herein described exceeded the 'bounds of reason' by two and a half country miles.'" 742 F.2d at 983 (quoting Doe v. Renfrow, 631 F.2d 91, 92–93 (7th Cir.1980) (footnote omitted)).

In an action rising out of this district, this Court held that videoing middle school age students in various stages of undress in a school locker room violated the students' Fourth Amendment rights, Brannum, 516 F.3d at 498. There, the Sixth Circuit affirmed this Court's denial of qualified immunity for the school officials who implemented the school video system.

> **Some personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion. . . . Stated differently, and more specifically, a person of ordinary common sense, to say nothing of professional school administrators, would know without need for specific instruction from a federal court, that teenagers have an inherent personal dignity, a sense of decency and self-respect, and a sensitivity about their bodily privacy that are at the core of their personal liberty and that are grossly offended by their being surreptitiously videotaped while changing their clothes in a school locker room. These notions of personal privacy are "clearly established" in that they inhere in all of us, particularly middle school teenagers, and are inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches. But even if that were not self-evident, the cases we have discussed, *supra,* would lead a reasonable school administrator to conclude that the students' constitutionally protected privacy right not to be surreptitiously videotaped while changing their clothes is judicially clearly established.**

We therefore conclude that the plaintiffs have adequately alleged a Fourth Amendment violation of their constitutional right to privacy because the students had a reasonable expectation of privacy and the invasion of the students' privacy in this case was not justified by the school's need to assure security. We further conclude that this constitutional violation is actionable because this particular right was clearly established at the time of the videotaping, such that a reasonable person who knew or ought to have known of the videotaping would be aware that what he or she was doing violated the Fourth Amendment. Therefore, the school officials directly involved in the decision to install the cameras and responsible for determining their locations, that is, defendants Beatty and Jolley, are not entitled to qualified immunity. Whether they are shown to have any personal liability to the plaintiffs is a question for determination by the fact finder, not this court.

Id. at 499-500 (emphasis added).

Given the Supreme Court's statement in T.L O. that "[a] **search of a child's person … is undoubtedly a severe violation of subjective expectations of privacy,**" 469 U.S. at 379 and the holding in Safford and the Sixth Circuit's repeated statements in Tartar, Beard and Brannum, the Court concludes that those statements of law are more than "capable of giving clear and fair warning to [school officials] even where the very action in question has not previously been held unlawful.'" Walker, 649 F.3d at 503-04 (quoting Smith v. Cupp, 430 F.3d 766, 776-77 (6th Cir. 2005) (internal citations omitted)).

Moreover, for an "extraordinary case," decisions of other Circuits can be considered on qualified immunity issues. Where prison officials asserted a qualified immunity defense to claims for cavity searches of prison visitors, the Sixth Circuit relied upon decisions of other Circuits to hold that the prison visitor's Fourth Amendment right to be free from a body cavity search was a clearly established constitutional right. Daugherty v. Campbell, 935 F.2d 780, 785-87 (6th Cir. 1991) (citing Supreme Court and the First, Fifth and Eighth Circuits to hold cavity searches of prison visitors to be a clearly established Fourth Amendment violation). Thus, the Court considers this comparable

search of B.H.'s labia to present an "extraordinary case," warranting consideration of other Circuit decisions.

Three other Circuits have held that strip searches of very young public school students violate the Fourth Amendment.[5]  Two Circuits' decisions in 1999 and 2003 involved medical examinations of young children's genitalia. <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 587, 601-02 (2d Cir. 1999) (holding <u>inter alia</u> that the removal of a five year old from kindergarten at a public school for an examination of her vagina and anus for possible sex abuse "without parental consent or judicial authorization violated [the child's] Fourth Amendment rights"); <u>Dubbs,</u> 336 F.3d at 1200, 1206-07, 1215 (physical examination, including genital examination of pre-elementary students in Head Start  programs, "constituted 'searches' within the meaning of the Fourth Amendment, and thus were unconstitutional unless they were performed with warrant or parental consent, or fall within the 'special needs' exception to the warrant requirement," but as discussed earlier, that Court found that the special needs doctrine could not justify such examinations without parental notice and consent on medical emergency).

Based upon these collective authorities, the Court concludes that the fundamental dignity of a young person's body is so obvious and the cited Supreme Court and Sixth Circuit decisions since 1984 provide more than fair warnings to school officials that such intrusive searches of students cannot be made by school officials without justification. The search of B.H. was not an emergency situation and was contrary to published national nursing standards and state educational standards for school nurses.  As evidenced by her nursing supervisor, <u>supra</u> at 5, Sliwowski's search was not

---

[5] <u>See also</u> <u>Jenkins ex. rel. Hall v. Talladega City Bd. of Educ.</u>, 95 F.3d 1036, 1043-48 (11th Cir. 1996) (involving teachers' strip search of two eight year old girls for $7 in stolen money), but in the <u>en banc</u> opinion <u>Jenkins ex. rel. Hall v. Talladega City Bd. of Educ.</u>, 115 F.3d 821 (11th Cir. 1997), the Eleventh Circuit did not decide whether a constitutional right was violated, only whether there was a clearly established right.

the "proper performance of [her] duties," Forrester, 484 U.S. at 223, that is a key rationale for qualified immunity. Applying Walker and Smith, the Court concludes that B.H.'s Fourth Amendment right to be free from such an highly invasive search was clearly established at the time of Sliwowski's search and that Sliwowski is not entitled to qualified immunity.

### 4. Metro's Liability

Given Plaintiff's insistence that the Magistrate Judge erroneously characterized her legal claim against Metro, the Court quotes Plaintiff's description of her theory of Metro's liability that is based upon "2007 Guidelines for Use of Health Care Professionals in a School Setting" and the "Tennessee Department of Education School Health Screening Guidelines" that "Metro should have been aware that *parental consent* is needed for the examination of children of tender years. That a policy should have been developed by Metro, the parameters of which were explained to school nurses in the form of *some type of training* on how to react to situations such as this, is without question." (Docket Entry No. 70, Plaintiff's Objections at 8) (emphasis in the original). Plaintiff also argues that the Magistrate Judge erred in characterizing Plaintiff's theory as a "single incident" Id. at 8. The Magistrate Judge stated, however, that Metro's motion for summary judgment should be denied if "some reasonable dispute exists as to whether [Metro] ignored an 'obvious' and 'foreseeable' risk that its nurses would unlawfully examine the genital areas of Metro students." (Docket Entry No. 69, Report and Recommendation at 24).

Unlike states, cities are persons that may be liable under § 1983 for their illegal acts or those of their employees, but only under certain conditions, where:

> [the employee's] action . . . implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[;]
> [There is] official municipal policy of some nature[;or]
> [The] execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy . . . .

Monell v. Department of Social Servs., 436 U.S. 658, 690, 691, 694, (1978). In a word, "the Monell Court held that only deprivations visited pursuant to municipal `custom' or `policy' could lead to municipal liability" under § 1983. City of Oklahoma City v. Tuttle, 471 U.S. 808, 818 (1985).

As to the quantum of proof required to establish liability of local governmental units under Monell, the plurality opinion of four Justices in Tuttle stated:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, **which policy can be attributed to a municipal policymaker.** Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But **where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality**, and the causal connection between the "policy" and the constitutional deprivation.

Id. at 823-24 (emphasis added and footnote omitted); accord Williams ex rel. v. Ellington, 936 F.2d 881, 884 (6th Cir. 1991) (a single strip search pursuant to an otherwise "facially valid [school board] policy" on student searches based upon T.L.O. is insufficient to state a claim against the municipal school board). An isolated act of any employee also does not establish a policy. Sargi v. Kent City Board of Education, 70 F.3d 907, 912 (6th Cir. 1995).

Later, however, in Pembaur v. City of Cincinnati, 475 U.S. 469, the Supreme Court, in another plurality opinion, held that the single decision of an authorized municipal decision maker, the district attorney, may be considered to set municipal policy and thereby be the basis of municipal liability under § 1983.

> **If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy"** as that term is commonly understood. **More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.** To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

Id. at 481 (emphasis added). The official's choice must be a deliberate decision to impose liability. Sargi, 70 F.3d at 912.

In a third plurality opinion, it was stated that whether a single official has policymaking authority for a municipality is a question of state law for the court. City of St. Louis v. Praprotnik, 485 U.S. 112, 124-26 (1988). As to the factors to consider, if state law is unclear, the plurality opinion in Praprotnik states:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

Id. at 127. Accord Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701(1989), (reaffirming Praprotnik that the issue of who possesses final policymaking authority is to be resolved as a question of state law before § 1983 liability can be imposed before the issue goes to the jury). In Marchese v. Lucas, 758 F.2d 181 (6th Cir. 1985), the Sixth Circuit applied this rule to the relationship between a county and its sheriff.

> We believe that the relationship between the County and the Sheriff's Department is so close as to make the County liable for the Sheriff's failure to train and discipline his officers and his ratification of the use of wanton brutality by members of his force which we have spelled out above. Obviously this holding is consistent with and indeed compelled by the U.S. Supreme Court's decision in Brandon v. Holt, supra.

Id. at 189. Where the sheriff was the "sole policymaker for the conduct of jail officials," the Court also found that imposing liability against the county was proper. Heflin v. Stewart County, 958 F.2d 709, 716 (6th Cir. 1992).

Based upon these authorities, a Section 1983 claim against a municipality requires proof of (1) the existence of an unconstitutional policy or custom, (2) the connection of the policy to the

municipality itself, and (3) a causal link between the unconstitutional policy and the particular injury alleged. Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120-21 (1992). The absence of a policy can also give rise to municipal liability where prior unconstitutional conduct should have provided notice to the municipality and its key officials, Brandon v. Holt, 469 U.S. 464, 466-67 nns. 3-5 (1985), or there is a disregard of an obvious need for medical care. Leach v. Shelby County Sheriff, 891 F.2d 1241 (6th Cir. 1989).

For certain claims against a municipality, there are specific evidentiary burdens to impose § 1983 liability. In City of Canton v. Harris, 489 U.S. 378 (1989), the Supreme Court addressed the requisite proof for a § 1983 claim against a municipality for physical injuries allegedly caused by inadequate training of its police officers.

> [The] first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. . . .
>
> * * *
>
> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . [A] municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. . . .
>
> Monell's rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." . . . But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said

to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

* * *

[T]he focus must be on the adequacy of the training program in relation to the tasks that the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? ...

Id. at 385, 388-391 (footnotes omitted).

The Canton standard for municipal liability is an objective one. Farmer v. Brennan, 511 U.S. 825, 841 (1994). The Canton standard of liability was later characterized as an "obvious[ness] test." Id. at 1580 (citing Canton, 489 U.S. at 396). In a word, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. The Supreme Court's most recent statement of this governing principle is that "To prove deliberate indifference, [plaintiff] needed to show that [the defendant] was on notice that, absent additional training, it was 'highly predictable' that [its employees] would be confounded by those gray areas

and make incorrect" decisions that violate plaintiff's constitutional rights. Connick v. Thompson, 131 S.Ct. 1350, 1365 (2011).

It must also be remembered that in this context, "deliberate indifference" under Canton "refers to indifference to injuries likely to result from a failure to act, not indifference to whether such injuries constitute deprivation of a constitutional right." Garner v. Memphis Police Dep't, 8 F.3d 358, 366 (6th Cir. 1993). In Barber v. City of Salem, 953 F.2d 232 (6th Cir. 1992), the Court distilled the Canton standard as follows:

> Furthermore, a municipality may also be liable under 42 U.S.C. § 1983 in certain circumstances for constitutional violations arising from its failure to properly train its employees. In order for a plaintiff to prevail against a municipality, the plaintiff must show that inadequate training represented a city policy and that **the need for better training was so obvious and the inadequacy so likely to result in a violation of constitutional rights, that the municipality can be said to have been deliberately indifferent to the need**.

Id. at 235-36 (citing Canton, 489 U.S. at 387-88) (emphasis added).

As to Metro's knowledge of any obvious risk in the context of physical searches of public school students, it must be remembered that since 1985, the Supreme Court clearly stated that in the school environment, "[a] **search of a child's person … is undoubtedly a severe violation of subjective expectations of privacy.**" T.L.O., 469 U.S. at 337-38. T.L.O. also cited its precedent that "[e]xceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and **where 'other safeguards' are available to assure that the individual['s] reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'**" Id., at 342 n.8 (emphasis added with internal marks omitted). Accord Watkins v. Millenium School, 290 F. Supp.2d 890, 901 (S.D. Ohio 2003). Again, prior to B.H.'s search, the Supreme Court stated: "T.L.O. **directed school officials to limit the**

**intrusiveness of a search, 'in light of the age and sex of the student and the nature of the infraction.'"** Safford Unified School Dist., 129 S. Ct. at 2643 (quoting T.L.O., 469 U.S. at 342).

As a matter of law, T.L.O. and Safford imposed legal directives upon school officials to formulate policies for searches of public schoolchildren so that "'other safeguards' are available to assure that the individual['s] reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'" T.L.O., 469 at 342 n.8. These directives were for policies sensitive to the "'age and sex of the student and the nature of the infraction.'" Safford, 129 S.Ct. at 2643 (quoting T.L.O., 469 U.S. at 342). Although Metro asserts that such a policy is impossible, as reflected by the Sixth Circuit's Ellington decision affirming a school policy citing T.L.O. standards, school boards have been able to set a policy since 1991. 936 F.2d at 884. T.L.O. does not require a policy for all searches, but policies that at least comply with T.L.O. standards as in Ellington. Metro does not offer any proof that its school nurses or their supervisor received **any** training on the Fourth Amendment principles for searches of a student's person or that such searches pose serious Fourth Amendment issues. The Sixth Circuit decisions prior to Sliwowski's search provide clear warning of the highly intrusive nature of these strip searches of public school students. Thus, as a matter of law, T.L.O. and particularly Safford, put school boards on notice of the need to provide policies, based upon the age and sex of students, to protect public school students from arbitrary searches of their persons by school employees in the field that can involve, as here highly intrusive violations of a fundamental constitutional right that school officials must take measures to protect.

As a factual matter on foreseeability, the National nursing training entities and Tennessee school health officials issued standards and guidelines, prior to the search of B.H. Those standards and guides address the necessity for parental consent for physical examinations of public school students:

[NASN's *School nursing: A Comprehensive Text*] states, "physical assessment of the genital region is not usually performed in the school setting." Although not cited in the evidence as one of the resources for school nurses serving the Metropolitan Nashville Public Schools, it is a nationally recognized school nursing resource and is readily available to school nurses.

According to another nationally recognized resource by NASN, *Quality Nursing Intervention In the School Setting*, even in those cases where sexual abuse might be suspected, a "physical inspection of the genital area is generally not done unless there are subjective and objective indicators of emergent bleeding."

*The 2007 Guidelines for the Use of Health Care Professionals and Health Care Procedures In a School Setting*, defines an emergency as "a serious situation that arises suddenly and threatens the life, limb, or welfare of one or more persons; a crisis." "An emergency creates a type of implied consent when the individual is unable to consent to treatment that is immediately necessary."

* * *

*The 2007 Guidelines for Use of Health Care Professionals and Health Care Procedures in a School Setting* also defines parental consent as: "written consent from a parent/guardian that is required before a student can be administered medication or be a recipient of health care procedures in a school setting." Parental consent is also discussed in the **Tennessee Department of Education School Health Screening Guideliness**. This resource addresses the fact that parental permission is needed in order for the school to perform the vision, hearing, scoliosis and other health screenings that are typically done by school nurses."

(Docket Entry No. 33, Exhibit 10 at 8-9). Sliwowski testified that if there had been a policy she would have followed that policy. (Docket Entry No. 33, Exhibit 1, Sliwowski Deposition at pp. 24-25).

Tennessee state education officials set standards that "Parental consent is also discussed in the **Tennessee Department of Education School Health Screening Guidelines**. This resource addresses the fact that parental permission is needed in order for the school to perform the vision, hearing, scoliosis and other health care screenings that are typically done by school nurses." (Docket Entry No. 33, Exhibit 10 at 9). NASN's *School nursing: A Comprehensive Text* also states, "'physical assessment of the genital region is not usually performed in the school

41

setting.'" Id. at 8. Defendants' proof is that "Physical assessment is an integral part of the registered nurse role." (Docket Entry No. 35, Bergren Declaration at ¶ 5g).

With these facts, a trier of fact could reasonably conclude that it was foreseeable that school nurses likely engage in highly intrusive searches of students. Yet, Metro's experts do not mention any policy or training on legal standards for school nurses' physical examinations of students based upon age and sex of the student as required by T.L.O. nor on the necessity of parental consent under the cited national and Tennessee school guidelines. Viewing the evidence in a light most favorable to the opposing party, as required on this type of motion, the Court concludes that a trier of fact could reasonably find that Metro had a policy or custom of leaving searches, such as these to the school nurse and/or particular school personnel, without any training on the Fourth Amendment's limitations on such searches despite the obvious likelihood of such searches.

Applying Connick, the Court concludes that under the facts here Plaintiff's proof is sufficient to prove that Metro was on notice that "absent additional training, it was 'highly predictable' that [its employees] would be confounded by those gray areas and make incorrect" decisions that violated Plaintiff's Fourth Amendment rights. Connick, 131 S.Ct. at 1365.

For these collective reasons, the Court concludes that the Magistrate Judge's Report and Recommendation (Docket Entry No. 69) should be set aside and the Defendants' motion for summary judgment (Docket Entry No. 26) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 26ᵗʰ day of January, 2012.

WILLIAM J. HAYNES, JR.
United States District Judge