IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MELISSA HEARRING, )
as natural mother and next friend of )
B.H., a minor child, )
)
    Plaintiff, ) Case No. 3:10-cv-0746
) Chief Judge Haynes
v. )
)
THE METROPOLITAN GOVERNMENT )
OF NASHVILLE AND DAVIDSON )
COUNTY, )
)
    Defendant. )

## MEMORANDUM

Before the Court is Plaintiff's motion for a new trial (Docket Entry No. 180). At trial, Plaintiff's claims were that the Defendant's nurse violated her minor daughter B.H.'s rights under the Fourth and Fourteenth Amendments by subjecting her minor daughter to a medically unjustified genital examination in the presence of a school official. The jury returned a verdict for the Defendant. In addition, Plaintiff's theory at trial was that Metro's failure to provide its school nurses guidance and information on the constitutional rights of its students in physical examination by school nurses caused the violation of B.H.'s Fourth and Fourteenth Amendment rights to her privacy and bodily integrity.

For a motion for a new trial, Fed. R. Civ. P. 59(a) requires the Court to determine if a jury could reasonably reach its verdict based upon the evidence. Powers v. Bayliner Marine Corp., 83 F.3d 789, 796 (6th Cir. 1996). A Court must also review the evidence "most strongly in favor of the

1

verdict." Ross v. Meyers, 883 F.2d 486, 488 (6th Cir. 1989). The jury decides all credibility issues. Farber v. Massillon Bd. of Ed., 917 F.2d 1391, 1395 (6th Cir. 1990). A jury verdict should not be set aside without a showing of a "'seriously erroneous result.'" Holmes v. City of Massillon, 78 F.3d 1041, 1045-46 (6th Cir. 1996).

The evidence showed that Metro was aware of, but did not inform or train its employees, including school nurses, on the privacy rights of Metro students under the Fourth and Fourteenth Amendments. Plaintiff's proof included the State of Tennessee's "2007 Guidelines for Use of Health Care Professionals and Health Care Procedures in School Settings" that states:

> The intent of the guidelines is to <u>give direction</u> to local school systems to <u>adhere to state law</u>. The guidelines have been written according to National recognized Standards established by the National Association of School Nurses and the National Council of State Board of Nursing, and in accordance with the "Tennessee Nurse Protection Act."
>
> . . . .
>
> <u>Heath Care Procedure</u>: Related to TCA Section 49-5-415, defined as any clinical activity or task performed by a licensed health care professional who is deemed competent and who practices within the boundaries of a regulatory board for the well-being of a student as prescribed by a licensed health care provider. (MD, NP, DO, dentist, PA).
>
> . . . .
>
> <u>Parental Consent</u>: Written consent from a parent/guardian that is required before a student can be administered medication or be a recipient of health care procedures in the school setting. Health Care procedures also require an order from the student's health care provider.
>
> . . . .
>
> <u>Parental Consent</u>: Written permission from a parent/guardian that is required before a student can be administered medication or be recipient of health care procedures in the school setting. Health Care procedures also require an order from the student's health care provider.

2

(Defendant's Exhibit 22 at 2, 6, 8 and 46) (emphasis added by Plaintiff). Chris Taylor, Director of Community Health for the Metro Nashville Public Health Department that includes school health, admitted that Metro had received this publication prior to October 29, 2009.

Plaintiff's trial proof included the "Tennessee School Health Screening Guidelines" that were provided to Metro and states, in pertinent part:

> PARENT/GUARDIAN NOTIFICATION
>
> Parents/Guardians that do not want their children screened for any health concern have the right not to have their children screened.
>
> * * *
>
> 7. <u>Weighing Children and Adolescents</u>:
>
> Procedures For all children, there is a need to respect privacy. Privacy includes where the measurements are taken, <u>clothing removal</u>.....

(Plaintiff's Exhibit 8 at 5, 27) (emphasis added by Plaintiff). Fred Carr, Metro's Chief Operating Officer for Metro Nashville Public schools, admitted receipt of this publication in 2008.

Fred Carr testified that Metro does not train or inform school nurses or school personnel on students' Fourth or Fourteenth Amendment rights at school.

> Q. And what policies did you implement that would guarantee the students their Fourth Amendment rights to privacy in schools?
>
> A. Fourth Amendment rights of privacy don't need a policy.
>
> Q. Oh. **Did you do any training with the school nurses and tell them about the fact that there was a Fourth Amendment right for students?**
>
> **A. No.**
>
> Q. **Did you do any training for school administrators, teachers, and other persons, about the Fourth Amendment rights of students?**
>
> **A. We did not train our principals, nurses or teachers about when or when not**

> to remove students' clothing.
>
> . . . .
>
> Q. I will ask the question again. It was a deliberate choice -- I'm asking you as a member of the executive committee that makes policy. It was a deliberate choice on the part of the Metropolitan Government not to train its employees on the Fourth Amendment rights of its school students?
>
> A. I'm confused. Are you asking about Fourth Amendment rights or taking off clothes?
>
> **Q. I'm asking about Fourth Amendment rights. Was it a decision of yours not to train your employees on what Fourth Amendment rights students have?**
> **A. We expect our employees to have professional judgment. They are trained and highly educated, and should understand what Fourth Amendment rights are through that professional training.**

(Docket Entry No. 184, Trial Transcript at 15-16, 18) (emphasis added).

As to school teachers' performance of their duties, Carr described Metro's policy as follows:

> Q. As an administrator, can you describe to the jury what role professional judgment plays in an employee's everyday activities?
>
> A. we try to develop policies that provide general guidelines for the way employees should behave. We hire teachers who are trained professionally with licenses -- college degrees and licenses and the nurses that the Health Department hires have licenses. And within with the general policies, we expect our employees to utilize professional judgment in the situations that they encounter numerous times a day. We do not develop specific policies for each potential situation that could arise.

Id. at 21-22.

Addressing the training of school nurses, Taylor testified as follows:

> A. Prior to this incident where the nurse did this, I would say that we did have training, and we did have policy in place. Again, our training was, if you encountered a situation where you didn't know exactly what to do, you were unfamiliar with that situation, you weren't sure, even sure about what you want to do, that you would contact your nurse supervisor or a nurse supervisor, or you could would contact your mentor to get additional assistance.
>
> And even beyond those two people, we have a chain of command beyond that. The

nurses can always contact me, and frequently did contact me, when they had questions. We also have a medical director that is over the program, Dr. Kimberly White Ethridge. And she is a pediatrician. And so the supervisor couldn't answer it, she couldn't answer it, we would go to Dr. -- we call her Dr. Kim, and seek her advice as well.

And then we also have established relationships both with Vanderbilt and with Meharry, both which are academic medical centers here in Nashville. And we work with several doctors in both of those and can contact them. So we have kind of a chain of communication that, you know, if I can't answer it, I'm going to find somebody else that can.

So I felt like that by having that standard, and along with our communication standard where we stress from day one that you have to communicate with parents about what's going on with their children, that in this particular situation we really don't need a policy to address all of the potential things that could occur in a school setting. But we rely on the nurses to follow that particular policy when they are not sure about what to do.

. . . .

Q. And with respect to what Ms. Sliwowski did, having encountered the child and taking her into the restroom, are there things that you would have expected her to do with the child in that moment, as the Director of school Health?

A. In retrospect, I have more information. When it very first occurred, again, I didn't know if this was a potential abuse situation, I didn't really know if this was an emergent event. I didn't really understand exactly why the nurse felt like she needed to do this evaluation.

So my expectation again would have been that the nurse would have done probably a little bit more complete assessment of what had actually been going on with the child. Obviously, the best thing would have been to contact the parent on the front end, to actually talk to the parent about what - - you know, the parent obviously would have known about what was going on with their child. And maybe even get some guidance from the parent. Would it be of any help if I checked see if there is a rash or something else going on, instead of just jumping in there and actually doing the inspection on her own and looking to see, you know, is something going on.

Q. Mr. Taylor, are there things that you have just described that you would have preferred her to do? Are those things that you teach your school nurses in your orientation program?

A. We do go over the nursing process when we talk to nurses. Again, in our clinical

5

practice manual, if you - - which we go over, page by page -- let me see if I can find it. I'm on Page 106. And if you look at -- I don't know if you want to put that up there. So the very first one there, provide nursing services to customers in the school community for the purpose of helping each child maintain an optimal state of health to enhance his or her education. And if you will look, the nursing process is outlined right there that we expect our school nurses to follow.

And the very first thing is doing an assessment when they run upon a situation, doing a plan, implement that plan, evaluate that plan. So this is something that we teach the nurses. But again, by hiring experienced nurses, we expect them to already come to our program with a high degree of understanding what their responsibility is as a nurse.

Q. As the Director of school Health, would you advise a nurse in your department to do a visual examination under the circumstances that Nurse Sliwowski encountered?

A. Under these circumstances, no. I would not. Had she called me, I would not have recommended that.

. . . .

Q. When you hire a person to be a school nurse, school nursing is a separate form of nursing, and it's not amenable to people without training to be a school nurse, it is?

A. It is a recognized specialty within nursing. And like when we do a job posting, the minimum qualification for a nurse coming into the program is one year of relevant nursing experience.

Q. But the Metropolitan Government is responsible for taking this person they hire and training them in the special area of school nursing, aren't they?

A. Yeah. And that's the purpose of our orientation program.

Q. Now, you mentioned this clinical practice manual that I believe is Defendant's Exhibit Number 23?

A. Yes, sir.

Q. And you said you went over it with the nurses page by page during this orientation?

A. Yes, sir.

Q. Well, can the witness be passed Plaintiff's Exhibit Number 4, please. Could you

turn to the employee class history, which I think is on Bates stamped 209 at the bottom. Yes, sir.

Now, as I understand it, on 11/12/08 you had a blood pathogens class?

A. Bloodborne pathogens.

Q. Right. And then on 12/4/08 you had Title VI; right?

Yes, sir.

Q. Pardon?

A. Yes, sir.

Q. And then on the same day, you had a new employee orientation; correct?

A. Yes, sir.

Q. And then on that same day, you had a talk about HIPAA forms?

A. Yes, sir.
. . . .

Q. And is anything - - let me just borrow these books here. **Is there anything in the scope of standards of professional nursing having to do with a student's right to privacy?**

A. **I don't three there is any privacy information in - - again, I would have to review those books to truthfully answer your question.**

Q. **New employees -- well now, you reviewed this book before you came in here today, because you were asked questions about it; right?**

A. **Yes, sir. But to answer specifically whether there is anything in that document about privacy, I can't say with a hundred percent certainty.**

Q. **But as a government employee, you have to be concerned dealing with student about their rights to privacy, don't you?**

A. **Right. Again, I think there has been testimony around the HIPAA thing, the BURPA thing, some of those.**

Q. I'm not talking about HIPAA. I'm talking about the right to privacy as talked about in Plaintiff's Exhibit Number 8 of the guidelines. They talk about a privacy of a child taking his clothes off. Do you understand the government employee has to consider those things when they deal with a private citizen?
....

Q. Do you understand that a governmental employee has to have knowledge and deal with and concern himself with private citizens' right to privacy? Do you understand that's something they have to do?

MS. BUSSELL: Objection. Calls for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: Again, I would say that I don't really fully understand what you are asking me. I think as a nurse we are trained around privacy of health information, privacy for the patients. But I don't do any extra training around, you know, now that you work for Metro Government, there is a different standard that you have to follow.

Q. So there is nothing in this new School Health Handbook, Third Edition, that teaches a nurse how to recognize the rights of privacy of the school student?

A. There is nothing.

Q. There is nothing in the Red Book, either, is there?

A. No, sir.

Q. There is nothing in the Lippencott Manual of Nursing Practice, is there?

A. And again, not that I know of, but –

Q. And, I think Ms. Blansett has already testified, there is nothing in the Clinical Practice Manual, either, is there?

A. No, sir.

Q. Now, given the difference between a governmental employee and a private employee in terms of relationship they have with private citizens, wouldn't it have been a proper thing for the school to have taught something to the nurses and telling them that they are now governed by certain laws that deal with their interaction between citizens?

**A. I've never known that to be required.**

(Docket Entry No. 185, Trial Transcript at 23-24, 26-27, 30-31, 33-35) (emphasis added).

Stephanie Blansett, a nurse supervisor, admitted that there was no training for school nurses on the privacy rights of students. Karen Sliwowski, the Metro school nurse who examined B. H., testified she had never been trained on the privacy rights of students. Metro's expert, Dr. Dewey Bergren, did not know if there were training on student privacy rights by Metro for its school nurses.

For certain claims against a municipality, there are specific evidentiary burdens to impose § 1983 liability. In City of Canton v. Harris, 489 U.S. 378 (1989), the Supreme Court addressed the requisite proof for a § 1983 claim against a municipality for physical injuries allegedly caused by inadequate training of its police officers.

> [The] first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. . . .
>
> * * *
>
> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . [A] municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. . . .
>
> Monell's rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." . . . But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the

policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a *policy* for which the city is responsible, and for which the city may be held liable if it actually causes injury.

\* \* \*

[T]he focus must be on the adequacy of the training program in relation to the tasks that the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? ...

Id. at 385, 388-391 (footnotes and citations omitted).

The Canton standard for municipal liability is an objective one. Farmer v. Brennan, 511 U.S. 825, 841 (1994). The Canton standard of liability is an "'obvious[ness] test.'" Id. (citing Canton, 489 U.S. at 396). As stated in Canton, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390 (footnote omitted). As the Supreme Court recently stated: "To prove deliberate indifference,

[plaintiff] needed to show that [the defendant] was on notice that, absent additional specified training, it was 'highly predictable' that [its employees] would be confounded by those gray areas and make incorrect" decisions that violated plaintiff's constitutional rights. Connick v. Thompson, 131 S.Ct. 1350, 1365 (2011).

"Deliberate indifference" under Canton "refers to indifference to injuries likely to result from a failure to act, not indifference to whether such injuries constitute deprivation of a constitutional right." Garner v. Memphis Police Dep't, 8 F.3d 358, 366 (6th Cir. 1993). In Barber v. City of Salem, 953 F.2d 232 (6th Cir. 1992), the Court distilled the Canton standard as follows:

> Furthermore, a municipality may also be liable under 42 U.S.C. § 1983 in certain circumstances for constitutional violations arising from its failure to properly train its employees. In order for a plaintiff to prevail against a municipality, the plaintiff must show that inadequate training represented a city policy and that **the need for better training was so obvious and the inadequacy so likely to result in a violation of constitutional rights, that the municipality can be said to have been deliberately indifferent to the need.**

Id. at 235-36 (citing Canton, 489 U.S. at 387-88) (emphasis added).

As to Metro's knowledge of any obvious risk in the context of physical searches of public school students, as a matter of fact, the Tennessee State Education department policies were "directives" to Metro on the necessity of parental consent for physical examination of students. The Tennessee school health officials issued standards and guidelines to warn about the necessity for parental consent for physical examinations of public school students. Here, the search was by a school nurse, but a school employee was present. These policies and the retention of school nurses evince the foreseeability of physical examinations of public school students by Metro school officials. Yet, Metro does not train its nurses and employees on any Fourth Amendment principles governing searches of minors in public schools.

In 1985, where a public school official searched a 14 year old student's purse for cigarettes and found evidence of marijuana, the Supreme Court stated that "[a] **search of a child's person ... is undoubtedly a severe violation of subjective expectations of privacy,**" New Jersey v. T.L.O., 469 U.S. 325, 337-38 (1985), and held that "the Fourth Amendment applies to searches conducted by school authorities." Id. at 337. T.L.O. also cited its precedent that "[e]xceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and **where 'other safeguards' are available 'to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'"** Id., at 342 n.8 (emphasis added with internal marks omitted). Months prior to B.H.'s search, the Supreme Court explained that: "**T.L.O. directed school officials to limit the intrusiveness of a search, 'in light of the age and sex of the student and the nature of the infraction.'**" Safford Unified School Dist. No. 1 v. Redding, 557 U.S. 364, 378 (2009) (quoting T.L.O., 469 U.S. at 342).

As a matter of law, T.L.O. and Safford imposed legal duties upon public school officials to formulate policies for searches of public school children so that "'other safeguards' are available 'to assure that the individual['s] reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'" T.L.O., 469 at 342 n.8 (internal quotation marks omitted). These directives were for policies sensitive to the "'age and sex of the student and the nature of the infraction.'" Safford, 557 U.S. at 378 (quoting T.L.O., 469 U.S. at 342). Although Metro previously asserted that such a policy is impossible[1], the Sixth Circuit's 1991 decision in Williams by Williams v. Ellington,

---

[1] Metro's impossibility argument was that because Metro could not envision every possible scenario of student searches, training and policy on student searches was impossible. Yet, implementing "safeguards" for student searches is required by the Supreme Court and State

936 F.2d 881, 884 (6th Cir. 1991) affirmed a school policy citing compliance with T.L.O. standards.

Applying the Canton standard, the Court concludes that under the facts here "absent additional specified training, it was 'highly predictable' that [Metro public school nurses and employees] would be confounded by those gray areas and make incorrect" decisions that could violate a student's Fourth Amendment rights. Connick, 131 S.Ct. at 1365. The school nurse here testified that she had not been trained on legal issues concerning physical examination of children. The Tennessee State Education policies identify the obvious instances involving searches of public school children.

In addition to the Supreme Court decisions, the decisions in the Sixth Circuit, including this action, Hearring v. Sliwowski, 712 F.3d 275 (6th Cir. 2013), described the various factual circumstances in which students' Fourth Amendment rights are impacted. See Tarter v. Raybuck, 742 F.2d 977, 979-80, 982 (6th Cir. 1984) (addressing public school officials' search of a student by removing his shirt and pants and requiring "reasonable cause to believe the search is necessary in the furtherance of maintaining school discipline and order, or his duty to maintain a safe environment conducive to education."); Beard v. Whitmore Lake School Dist., 402 F.3d 598, 602, 604-06 (6th Cir. 2005) (holding that public school officials' search of 25 high school students for stolen money that included 15 female students who had to pull up their shirts and pull down their pants, but were never touched and were not required to remove their underwear does not pass

---

policies also set state law requirements. As the late Judge Jerome Frank observed: "More than two thousand years ago, a profound student of government, from whom we derive the concept of a 'government of laws, and not of men,'"Guiseppi v. Walling, 144 F.2d 608, 615 (2nd Cir. 1944), explained that "'all law is couched in general terms,.... For it is plainly impossible to pronounce with complete accuracy upon such a subject matter as human action ... For where the thing to be measured is indefinite the rule must be indefinite...'" Id. at 616 n.15A (quoting Aristotle, Politics and Nicomachean Ethics, Bk. V. Ch. 10, 1137b, 13-31) (quotation marks omitted).

constitutional muster); Brannum v. Overton County School Bd., 516 F.3d 489 (6th Cir. 2008) (holding that videotaping middle school age male and female athletes in various stages of undressing in a school locker-room violated the students' Fourth Amendment rights). See also Watkins v. Millenium School, 290 F. Supp.2d 890, 901 (S.D. Ohio 2003) (disputed search of student by opening student's pants to see underwear for stolen money required reasonable individualized suspicion).

The Metro Health department trains public school nurses on HIPPA andd Title VI, but not on relevant Constitutional rights impacted by their work with school children. The Court does not discern any impediment to adding the Fourth Amendment principles and State education policies to this training. The school officials who have the authority to search a public school child need training on basic principles of the Fourth and Fourteenth Amendments. Metro also lacks any training on legal standards or "safeguards" for school nurses' physical examinations of students based upon age and sex of the student. This training is expressly required by T.L.O. The excerpts from the Supreme Court and Sixth Circuit decisions quoted in the Court's earlier ruling (Docket Entry No. 73, Memorandum at 21-26, 30-32, 39-40) can provide the requisite guidance on the general principles to be applied to student searches.

While the Court concludes that a new trial is not warranted, the Court concludes that injunctive relief is necessary to ensure that school nurses and/or school personnel who are authorized to search students are trained on the Fourth and Fourteenth Amendments' limitations on physical searches of public students. Given the obviousness of such searches and the need to provide safeguards to assure that the individual children's reasonable expectation of privacy are protected, injunctive relief is necessary. This injunctive relief is to require training of the relevant Metro school employees to ensure that the children's Fourth Amendment rights are not subject to the discretion

of the school official in the field. Notwithstanding Supreme Court decisions and State educational policies to ensure safeguards for school children's privacy this training is not provided.

For these collective reasons, Plaintiff's motion for a new trial should be denied, but Plaintiff should be awarded injunctive relief.

An appropriate Order is filed herewith.

ENTERED this the ___8th___ day of August, 2014.

WILLIAM J. HAYNES, JR.
Chief United States District Judge